The **ENVIRONMENTAL RIGHTS COALITION, INC., et al.,**
Plaintiffs,

v.

Richard G. **AUSTIN, in his capacity as Administrator of the General Services Administration, an agency of the United States Government, et al., Defendants.**

No. TH 90–89–C.

United States District Court,
S.D. Indiana,
Terre Haute Division.

Dec. 23, 1991.

Michael C. Kendall, Kendall Law Offices, Indianapolis, Ind., for plaintiffs.

Sue Hendricks Bailey, Asst. U.S. Atty., Indianapolis, Ind., Sylvia Walker, U.S. Atty. Gen., Dept. of Justice, Washington, D.C., Robert L. Wright, Norman Lowery, Wright Shagley & Lowery, Terre Haute, Ind., Evan Steger, Indianapolis, Ind., Gregory S. Carter, Trueblood Harmon Carter & Cook, Terre Haute, Ind., for defendants.

ENTRY ON JURISDICTIONAL ISSUES

TINDER, District Judge.

I. *Introduction*

The subject matter of this lawsuit, a dispute involving an environmental organization and actual or threatened governmental action, is often before the federal courts. *See, e.g., Eagle Foundation, Inc. v. Dole*, 813 F.2d 798 (7th Cir.1987); *Protect Our Eagles' Trees v. City of Lawrence*, 715 F.Supp. 996 (D.Kan.1989); *Duck River Preservation Ass'n v. Tennessee Valley Authority*, 410 F.Supp. 758 (D.Tenn.1974), *aff'd* 529 F.2d 524 (6th Cir. 1976); *Cape Henry Bird Club v. Laird*, 359 F.Supp. 404 (D.Va.1973), *aff'd* 484 F.2d 453 (4th Cir.1973) (per curiam). Often these suits are premised on the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. This is the story of one such controversy.

The litigants in this case are The Environmental Rights Coalition, Inc. ("TERCI") and two groups of defendants sued by TERCI, the "federal defendants"[1] and the "Vigo County defendants."[2] The prize in

---

**1.** The federal defendants consist of the following individuals sued in their official capacities: Richard G. Austin, Administrator of the General Services Administration ("GSA"); Donald Zito, Regional Administrator for GSA; and Dennis R. Spearman, Director of the Chicago Real Estate Sales Field Office of GSA.

**2.** The Vigo County defendants consist of Vigo County, Indiana; the Vigo County Board of Commissioners; James Diehl, individually and

the parties' dispute is a 1,508.2 acre tract of land known as the Vigo County Farm (the "Vigo Farm"), located approximately five miles south of Terre Haute in Vigo County, Indiana. Govt. Exh. B at 2.

All of the disputed land, except for 17.65 acres has been sold by the General Services Administration of the federal government ("GSA") to Vigo County. Ultimately, it became public knowledge that Vigo County was negotiating to sell the Vigo Farm to BASF Corporation and that BASF hoped to construct an automotive paint manufacturing facility and a hazardous waste facility on the Vigo Farm site.

Predictably, the spectre of a paint manufacturing plant and hazardous waste disposal site located on formerly desolate farmland raised the dander of some area residents who became concerned about the potential impact of the proposed development on the environment, their children and upon property values. Numerous concerned citizens complained about the danger of a potential polluter in their midst. Eventually, TERCI threw Vigo County's negotiations with BASF into turmoil by taking Vigo County into court.

Vigo County's contract with BASF gave BASF an escape hatch permitting BASF to back out of the purchase of the Vigo Farm if there was pending litigation concerning the Farm on the closing date of September 1, 1990. On April 11, 1990, TERCI filed its complaint in federal court. Subsequently, TERCI twice amended its complaint. Because this dispute was unresolved, on September 1, 1990, BASF backed out of its contract to purchase the Vigo Farm. Thus, in some sense, TERCI may have won this war before a shot was fired.[3]

By this lawsuit, TERCI hopes to void the sales that have taken place and cause the land to be returned to the federal government pending GSA's completion of an Environmental Impact Statement ("EIS"). Under NEPA agencies of the federal government are required to prepare an EIS before undertaking major federal action which will "significantly affect.... the quality of the human environment." 42 U.S.C. § 4332.

Regulations promulgated pursuant to NEPA require that before GSA implements a major federal action it must conduct an environmental assessment ("EA"). The EA is a preliminary inquiry which indicates the need for an EIS. The EA may result in a Finding Of No Significant Impact ("FONSI") which is a conclusion that GSA's proposed conduct is not a major federal action significantly affecting the environment. A FONSI thus eliminates the need to issue a detailed EIS. With respect to both parcels of the Vigo Farm sold by GSA, the agency issued a FONSI and, therefore, did not issue an EIS.

Sales of federal land have been found to be major federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332. *See, e.g., Conservation Law Foundation of New England, Inc. v. General Services Administration*, 707 F.2d 626, 633 (1st Cir.1983) ("GSA does propose to dispose of surplus federal property, and the environmental consequences of that action are the proper subject of an EIS"); *Rhode Island Committee on Energy v. General Services Administration*, 561 F.2d 397 (1st Cir.1977) (upholding district court's decision to require GSA to prepare an EIS before sale of excess property); *see also National Forest Preservation Group v. Butz*, 485 F.2d 408, 411 (9th Cir.1973) ("We do not 'doubt' that NEPA applies to this massive land exchange"). The parties in this case do not dispute that the sale of portions of the Vigo Farm was a major federal action. Thus, the only substantive issues left in this case are whether GSA's sale of the

in his capacity as Vigo County Commissioner; James E. Adams, individually and in his capacity as Vigo County Commissioner; and John A. Scott, individually and in his capacity as Vigo County Commissioner.

3. Even though TERCI's claim is dependent upon an alleged joint venture between the federal defendants and the Vigo County defendants to sell the Vigo farm to BASF, this court does not consider the controversy moot because even though BASF backed out of its original contract to buy the land nothing would prohibit BASF from purchasing the land after this lawsuit is resolved.

largest part of the Vigo Farm had a significant effect on the environment and whether its potential sale of the remaining 17.65 acres would have such an effect. If these sales had a significant environmental impact then GSA violated NEPA by failing to complete an EIS.[4]

■ Even if there was a violation of NEPA, however, that does not mean that there is a remedy available to TERCI. It is quite clear that, absent extenuating circumstances, NEPA does not constrain the actions of non-federal entities. *See, e.g., Atlanta Coalition on the Transportation Crisis, Inc. v. Atlanta Regional Commission*, 599 F.2d 1333, 1344 (5th Cir.1979) ("Congress did not intend NEPA to apply to state, local, or private actions"); *Ely v. Velde*, 451 F.2d 1130, 1139 (4th Cir.1971) ("NEPA by [its] very language impose[s] no duties on the states and operate[s] only upon federal agencies"). Moreover, GSA has already sold most of the farm to Vigo County. Title to the land has passed to the County, and it has frequently been held that NEPA does not afford post-completion relief. *See, e.g., Conservation Law*, 707 F.2d at 636 (noting that, "GSA ... has no power [under NEPA or any other law] to control" development on former government land once that land has been sold); *South East Lake View Neighbors v. Department of Housing and Urban Development*, 685 F.2d 1027, 1039 (7th Cir.1982) (denying relief under NEPA where "building [was] in the final stages of construction"); *Richland Park Homeowners Ass'n, Inc. v. Pierce*, 671 F.2d 935, 941 (5th Cir. 1982) ("the basic thrust of the NEPA legislation is ... not to serve as a basis for after-the-fact critical evaluation subsequent to substantial completion of the construction"); *Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377, 1379 (9th Cir.1978) (denying post-completion relief on moot-

ness grounds because the court did not have authority to "undo what has already been done"); *Ogunquit Village Corp. v. Davis*, 553 F.2d 243, 246 (1st Cir.1977) (denying "post-completion relief"). That does not mean that other state and federal environmental regulations are not applicable. It does mean that NEPA may no longer apply.

This court set forth these jurisdictional concerns in a memorandum entry accompanying this court's order bifurcating the trial on the jurisdictional and substantive issues in this case. *See* Memorandum Entry of August 30, 1990. In that entry this court ruled that because NEPA does not provide a remedy against non-federal defendants, Vigo County's sale of the farm to BASF could not be rescinded unless a joint venture or partnership between Vigo County and GSA were proved.

In reaching this conclusion this court was relying on cases holding that NEPA can be applied to a non-federal entity where that entity is acting in partnership with the federal government. *See, e.g., Biderman v. Morton*, 497 F.2d 1141, 1147 (2nd Cir.1974) ("it is well settled that non-federal parties may be enjoined, pending completion of an EIS, where those non-federal entities have entered into a partnership or joint venture with the Federal Government"); *Silva v. Romney*, 473 F.2d 287, 289–90 (1st Cir.1973) ("it is 'beyond challenge' that one in partnership with the federal government can be prohibited from acting in a certain manner"); *see also Scottsdale Mall v. State of Indiana*, 549 F.2d 484, 489 (7th Cir.1977) ("Indiana seeking and receiving federal approval at various stages of the project and receiving preliminary financial benefits so imbued the highway project with a federal character that, notwithstanding the state's with-

---

**4.** This court recognizes that what is considered a "significant" environmental impact may not be the same today as it was in the past. The Seventh Circuit has found "some evidence in the recent cases of a loosening of the judicial reins on agency decisions not to require environmental impact statements." *River Road Alliance, Inc. v. Corps of Engineers of United States Army*, 764 F.2d 445, 450 (7th Cir.1985) (listing cases),

*cert. denied*, 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986). "[T]oday, for good or ill, environmental assessments are thorough enough to permit a higher threshold for requiring environmental impact statements ...; routinely requiring such statements would use up resources better spent in careful study of actions likely to harm the environment substantially." *Id.* at 451.

drawal of the project from federal funding consideration, compliance with federal environmental statutes was necessary"), *cert. denied,* 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978).

On November 16, 1990, this court heard evidence relating to plaintiff's contention that this court has jurisdiction to resolve the merits of this suit brought under NEPA. The limited jurisdictional issue presented to this court in the November 16 hearing, which this entry addresses, is whether TERCI could prove a relationship between GSA and Vigo County sufficient to give this court jurisdiction over the county defendants pursuant to NEPA.

## II. *Findings of Fact*

During the time that it was owned by the federal government, the Vigo Farm was used primarily as a prison farm in connection with the federal penitentiary in Terre Haute. The Department of Justice discontinued this use in 1983. On March 24, 1984, 1476.56 acres of the Vigo Farm (hereafter described as "Parcel 1") were declared excess federal property. In August of that year GSA began to explore the possibility of selling Parcel 1 to Vigo County, the State of Indiana or a private party.

In October of 1984 the Mayor of the City of Terre Haute wrote to GSA concerning the interest of both the City of Terre Haute and Vigo County in acquiring Parcel 1. Thereafter, in December of 1984 the West Central Indiana Economic Development District, Inc. ("WCIEDD") prepared a feasibility study "at the request of the Vigo County Council and Vigo County Commissioners in order to determine the feasibility of obtaining and developing the Terre Haute Penitentiary Prison Farm property for industrial use." Pl. Exh. 15 at i. TER-

CI's counsel did not seek to introduce this study into evidence.

Counsel contends that he did not introduce the study because this court ruled that a question to the executive director of the Terre Haute Redevelopment Commission, asking whether the executive director assisted in the marketing of the Vigo Farm property, was irrelevant. This court took the position that the question to the executive director was not relevant because it could not have been probative of a partnership between the Vigo defendants and GSA as TERCI could proffer no evidence that GSA provided funds to the Commission for any purpose related to the Vigo Farm property.[5]

TERCI's attorney did proffer the study as part of an offer of proof at the November 16, 1990 hearing. *See* Transcript at 139–140. TERCI's attorney also submitted in his offer of proof that "[i]n 1984, the West Central Economic Development District, Inc. received a grant in the amount of $50,000 from the U.S. Department of Commerce Economic Development Administration" and that this grant money went toward the salaries of the individuals who prepared the feasibility study. *Id.* Plaintiff's theory is that, because some federal funds (albeit funds from the United States Department of Commerce and not GSA) went into this study the study and funding are relevant to show a partnership between GSA and the County defendants.[6]

The feasibility study contains general information concerning the Vigo Farm site and its potential for economic development. After reviewing the study, it is obvious to this court that the study was prepared for use by the Vigo County Commissioners to assist them in their decision regarding whether to purchase the Vigo Farm for

---

5. TERCI's counsel offered several alternative theories regarding why evidence of this feasibility study, as well as evidence of several other studies funded in part by dollars originating in the federal fisc, was admissible, including the theory that only a partnership between the Vigo defendants and the "federal government" (as opposed to a specific agency of the federal government) needed to be proved and the theory that the evidence of the studies was relevant to show a partnership between the county de-

fendants and GSA because GSA benefitted from the studies and knew or should have known that the studies were being conducted.

6. *See supra* at footnote 5 noting plaintiffs' additional theory that jurisdiction under NEPA could attach if the county defendants were found to be in partnership with the "federal government" as opposed to just a single agency of that government.

industrial development. Indeed, the study states that it "was prepared at the request of the Vigo County Council and Vigo County Commissioners in order to determine the feasibility of obtaining and developing the Terre Haute Penitentiary Prison Farm for industrial use." Pl.Exh. 15 at i. The study further notes that its authors did "not propose to make a judgment on property development, but to present the information necessary for the county officials to make an informed decision on their involvement in the development." *Id.* There was no evidence or offer to prove that this study was *written* to assist in marketing the Vigo Farm property.[7] Instead, this court finds that the study was used only to present information to the county commissioners regarding the potential eventual purchase of Parcel 1.

On April 4, 1985, GSA completed a disposal plan for parcel 1. According to the disposal plan GSA planned to sell all but 17.65 acres of the 1476.56 acres (a total of 1,458.91 acres)[8] to Vigo County by negotiated sale if a drilling study did not reveal significant amounts of coal under the land. The disposal plan was approved, no coal was found, and on October 15, 1985 GSA completed its environmental assessment ("EA") of this acreage.

The EA resulted in a FONSI. The EA noted that if the county purchased the land, it planned to develop the property for industrial use and to solicit companies to locate an industrial facility on the site. With specific reference to the effects of industrial development, the FONSI stated that:

> Environmental effects resulting from industrial development of the property (possible increases in air polluting or water polluting emissions, for example) would for the most part be subject to environmental laws and regulations requiring that such emissions remain within established limits and precluding any action having a significant negative impact on the environment. Effects not subject to such laws and regulations (such as a possible increase in noise) are expected to be fairly limited in scope and should not have a significant negative effect on the environment.

Accordingly, GSA determined that no EIS needed to be prepared before sale of the land to Vigo County. Thereafter, on December 17, 1986 GSA sold the 1,458.91 acre parcel (hereafter described as "Parcel 1(a)") to Vigo County by negotiated sale.

The contract by which GSA sold Parcel 1(a) to Vigo County contained an "excess profits clause." This excess profits clause provided that if Parcel 1(a) or any part of it were sold by Vigo County within a three year period following Vigo County's purchase of that parcel any profit received by the County (over its costs of purchasing or improving the property) would be remitted to GSA.[9] Federal regulations required that

---

7. Indeed, TERCI has never claimed that the feasibility study was *written* in order to help market the land to BASF. Moreover, although TERCI's counsel stated that Plaintiff's Exhibit 15 "was part of the marketing plan to BASF," *see* Trans. at 116, TERCI's offer to prove did not contain such a representation. In the end, however, whether the representation that Plaintiff's Exhibit 15 was part of the marketing plan to BASF was properly included in plaintiff's offer to prove matters little as TERCI's counsel never suggested that GSA had any prior knowledge or should have known that the feasibility study (which was not originally produced as a marketing tool) would, in the future, be used to market the property to BASF. Without such knowledge on the part of GSA this court is at a loss to understand how a "feasibility" study (written to convince the county commissioners to buy the land) even if it had been funded by GSA could be probative of a partnership to sell land to BASF as BASF was not even known to be a potential buyer of the land at the time that the study was drafted.

8. It is interesting that subsequent studies concerning the land characterize it as a 1476 acre parcel. *See* Pl. Exh. 16 at 1 (not admitted into evidence); Pl. Exh. 17 at 1 (not admitted into evidence). There was some indication at the hearing that Vigo County's representatives, at the time they purchased the 1,458.91 acres from GSA, may have thought that they were purchasing the entire 1476.1 acres that had originally been declared excess. *See* Trans. at 30–31.

9. The excess profits clause stated, in part, that:

> If at any time within the 3–year period from the date of this conveyance, the Grantee or its successors or assigns shall sell or enter into agreements to sell [all or part of] the proper-

such an excess profits clause be contained in any deed resulting from a negotiated sale of government property. 40 CFR § 101–47.304–9(c).

An additional 31.64 acre tract (also described hereafter as "Parcel 2") was declared excess property by the Department of Justice on May 14, 1987, and was sold by auction to Vigo County on November 10, 1988. GSA mailed notice of the auction to over 3500 entities, including Vigo County, that GSA considered to be likely purchasers of the property. In addition, GSA placed an ad about the auction in several Vigo County area newspapers.

The 31.64 acre tract was sold by auction rather than negotiated sale because GSA had learned that Vigo County intended to merely turn around and sell its recently purchased 1,458.91 acre parcel to private industry. TERCI asserts that GSA regulations prohibit negotiated sales to governmental entities where the local entity merely intends to be a pass-through, allowing the property to be purchased from it by a private party. There was no evidence, however, that GSA knew that Vigo County intended to pass-through the original 1,458.91 acre tract when GSA sold that tract in 1986.[10]

A FONSI was also issued with respect to Parcel 2. This FONSI was the result of an EA completed by GSA on May 26, 1987. Although GSA knew at this point that Vigo County was likely to sell Parcel 2 to BASF if Vigo County acquired the property, there is no evidence that GSA knew that BASF intended to build a paint facility and a hazardous waste landfill and incinerator on the Farm property. GSA did not acquire this specific knowledge until the Fall of 1988. Moreover, while GSA had some knowledge that a sale by Vigo County of some of the Farm property to BASF was

likely, the land sale contract between BASF and Vigo County for some 296.7 acres of the Farm was not executed until December 1, 1989 following a competitive bid process.

The remaining 17.65 acres of the Vigo Farm property (also described hereafter as "Parcel 3") (which had originally been declared excess property as part of Parcel 1 in the 1984 report of excess property) is sometimes referred to as the "burn area" because government records indicate that munitions may have been burned on a 4.4 acre section of this tract when the Vigo Farm area was part of a much larger piece of property that the federal government had purchased in the early 1940's as the site for the Vigo Ordnance Plant. Although the 17.65 acre site was originally reported as excess property and Vigo County has expressed an interest in purchasing it, it has not been sold and remains in the possession of the United States Government. Moreover, disposal of this property by GSA is not imminent. No disposal plan describing the manner in which GSA intends to sell the property has yet been completed with respect to this property. In addition, GSA has represented that it will not sell the 17.65 acre parcel until the Army Corps of Engineers completes a decontamination study of the property. The holding agency for federal property is responsible for the alleviation of hazardous conditions on federal land. *See* 41 C.F.R. §§ 101–47.401–4, 101–47.402.–1.

Some of the land already sold by GSA to Vigo County (in Parcels 1(a) and 2) is part of a 100 year floodplain and, a portion of this land consists of wetlands. Although the Vigo Farm was the subject of two excess property reports and three divisions for the purpose of sale to the public, there is no evidence that this property was seg-

---

ty, either as a single transaction or in a series of transactions, it is covenanted and agreed that all proceeds received or to be received in excess of the Grantee's or a subsequent seller's actual allowable costs will be remitted to the Grantor.
Pl.Exh. 3. "Actual allowable costs" include the cost of acquiring the property and the cost of physical improvements made to the property.

**10.** Although TERCI alleges in its brief that the county and federal defendants knew or should have known in August 1986 that the county defendants merely intended to act as a conduit for the sale of parcel 1 to BASF, *see* Plaintiff's Post Hearing Brief at 11, at the hearing TERCI presented no evidence of any actual knowledge on the part of the federal defendants.

mented by GSA for the purpose of avoiding any of the requirements of NEPA or any other environmental law.

As part of its sole offer of proof—made in response to this court's ruling that whether the executive director of the City of Terre Haute Redevelopment Commission assisted in marketing the Vigo Farm was irrelevant because the Commission received no funds or other assistance from GSA—TERCI proffered evidence of five studies concerning the property at issue in this lawsuit. Only three of these studies were prepared by or for the Terre Haute Redevelopment Commission, however. Moreover, two of these three studies were prepared after the sale of Parcel 1(a) and may have been prepared after GSA knew that Vigo County hoped to resell part of Parcel 2 to BASF. For these reasons subsequent studies may arguably have been more relevant to the plaintiff's case than the initial feasibility study prepared by the Terre Haute Redevelopment Commission. TERCI's counsel, however, never attempted to introduce the subject matter of any of these later studies into evidence.

TERCI's offer of proof indicated that Exhibit 16 would have been offered as evidence of a promotional brochure concerning the Vigo Farm site which was prepared after the sale of Parcel 1(a) to the Vigo County defendants. It was represented that this brochure was prepared by the Alliance for Growth and Progress ("the Alliance") which was partially funded by Job Training Partnership Act ("JTPA") funds allocated by the Department of Labor to the Indiana Department of Commerce and eventually transferred to the Alliance. This brochure exclusively concerned the land declared excess in Parcel 1.

In his offer of proof TERCI's counsel represented that Exhibit 17 would have been offered as the "Vigo County Industrial Park Study" prepared by United Consulting Engineers, Inc., completed in June, 1987, and paid for by a technical assistance grant to Vigo County by the Indiana De-

partment of Commerce which received funds from the federal Department of Housing and Urban Development block grant program. A reading of Exhibit 17 indicates that it was directed solely at the land declared excess in Parcel 1.

TERCI's counsel's offer also represented that Exhibit 19 would have been introduced and that Exhibit 19 was a "Water Supply Evaluation" prepared by Bennett, Williams & Blattert, Inc. in October 1988 for the Terre Haute Redevelopment Commission. TERCI's Counsel represented that $15,000 out of a $19,000 total cost for the study was paid for by JTPA funds that were funneled to the Terre Haute Redevelopment Commission from the United States Department of Labor through the Western Indiana Private Industry Council, Inc. (WIPICI). The water supply evaluation states that it was prepared "to evaluate methods and suggest plans for providing [a] ... water supply" for the proposed Vigo County Industrial Park site.[11]

Finally, counsel's offer of proof contained a representation that Exhibit 14, an "Economic Development Plan for Vigo County Industrial Park," dated November 15, 1988, and prepared by the Terre Haute Redevelopment Commission for the Vigo County Redevelopment Commission would have been introduced. Counsel for the plaintiff represented that this study was funded "at least [in] part" by the Western Indiana Private Industry Council, Inc. and that WIPICI received some JTPA dollars from the United States Department of Labor. A review of Exhibit 14 indicates that its primary utility was as a proposed plan to be adopted by the Vigo County Council to guide the development of the Vigo Farm. TERCI produced no evidence regarding whether the plan was eventually adopted in the form of Exhibit 14.

After making the offer to prove, the final aspect of evidence presented by TERCI's counsel was the brief testimony of Margaret H. Berry, President of TERCI.

---

11. It is interesting to note that by the time this study was prepared Vigo County must have come to the realization that its original purchase did not include the 17.65 acre burn area because the study expressly referred to "a 1457 acre site." Pl.Exh. 19 at 1.

Ms. Berry testified that Vigo County Commissioner James Diehl told her on October 18, 1989, that he had known for one and a half years that BASF hoped to buy part of the old Vigo Farm. On redirect examination, however, Ms. Berry recanted and stated that the conversation with Commissioner Diehl had actually taken place on October 18, 1988. If Ms. Berry's later representation is accepted as accurate, it is some evidence that Vigo County knew of BASF's interest in the Vigo Farm in early 1987 after the sale of Parcel 1(a) but before the sale by auction of Parcel 2 to Vigo County.

### III. *Discussion of NEPA's Application to Non–Federal Entities*

Mother nature is not what she used to be. No longer the seemingly inexhaustible resource of the past, mankind now knows that the environment needs nurture and protection. At issue here is one of the laws Congress has enacted to provide a measure of such protection.

This law, the National Environmental Policy Act (NEPA), is but a sliver in the broad mosaic of federal laws protecting the environment. Moreover, the requirement of 42 U.S.C. § 4332 that federal agencies file environmental impact statements before undertaking major federal actions with significant environmental effects is a single aspect of NEPA. Nevertheless, the EIS requirement has proven a thorn in the side to an enormous brood of defendants since the law went into effect on January 1, 1970.[12] The extensive impact of this law, however, is probably not due to its breadth, rather the requirement comes into play so much because federal agencies are so often involved in actions affecting the environment.

There can be no doubt that GSA, the only federal agency sued by TERCI, has been involved in this action affecting the environment. As this court has noted, the sale of federal land has been held to be a major federal action subject to the constraints of

NEPA. *See Conservation Law,* 707 F.2d at 633. Moreover, for the purpose of deciding whether this court has jurisdiction over the Vigo County defendants, this court may assume that NEPA required GSA to file an EIS prior to selling any part of the Vigo Farm. The question addressed at the hearing and the one to which this opinion is directed, however, is the appropriate limit on this court's authority under NEPA once land has been sold to a non-federal entity.

It is perhaps appropriate to begin this discussion of NEPA's applicability by noting that NEPA does not create "substantive rights." *Bradford Township v. Illinois State Tollway Authority,* 463 F.2d 537, 540 (7th Cir.1972), *cert. denied,* 409 U.S. 1047, 93 S.Ct. 518, 34 L.Ed.2d 499 (1972). Rather, "the judicially reviewable duties imposed by the Act are 'essentially procedural.'" *State of Wisconsin v. Weinberger,* 745 F.2d 412, 416 (7th Cir. 1984); *see also Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978) ("NEPA does set forth significant substantive *goals* for the Nation, but its mandate to the agencies is essentially procedural") (emphasis added); *South East Lake View,* 685 F.2d at 1038 (NEPA affords "only a procedural right to have ... interests considered in the agency decision-making process before a final decision is reached").

The purpose of NEPA was not to invest in the general public the prerogative to demand environmental changes or even to insist on the environmental status quo, but it was to require federal agencies to take a "hard look" at the environmental equation before engaging in major federal action. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). Thus, *agencies* of the federal government must undertake the thorough review of environmental factors mandated by the EIS process before they embark upon actions that will significantly

---

**12.** Indeed, the annotations to the cases discussing this provision cover over 150 pages in the U.S.C.A.

affect the environment.[13] On the other hand, it has been frequently held that NEPA does not provide authority for constraining, restraining or detaining *non–federal* entities pursuant to NEPA unless those entities are in a partnership or joint venture with or otherwise closely associated with a federal agency. *See, e.g., Town of North Hempstead v. Village of North Hills*, 482 F.Supp. 900, 903 (E.D.N.Y.1979) ("NEPA ... by its express language operates only upon federal agencies and imposes no duties on the States or on municipalities ... except to the extent that a non–federal entity is found to be acting in partnership with the federal government"). Without the requisite involvement in a project by a federal agency the project simply does not involve "major federal action" no matter how much the project may impact the environment.

Courts have struggled to some extent with the rationale for, and theory behind, constraining non-federal entities via NEPA. One rationale advanced by the courts is that non-federal entities may be reached where they have entered a relationship with the federal government that presumes their consent to federal regulation. *See, e.g., Biderman*, 497 F.2d at 1147 ("The rationale behind this extension of federal power appears to be grounded in notions of consent"). In cases like *Biderman* the courts may, perhaps, be suggesting (not unreasonably) that those who feed from the federal trough, for instance by accepting federal funding for a project with significant environmental effects, should expect to abide by the regulations of their benefactor.

A concept related to the "consent" rationale is the theory that a non-federal entity

may be enjoined via NEPA when it has yielded to a federal agency "the ability to *influence or control* the outcome [of the project] in material respects." *Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir.1988) (emphasis added); *see also Atlanta Coalition on the Transportation Crisis*, 599 F.2d at 1347 (finding NEPA inapplicable where there was federal funding for the planning process of a city project but there was not "any sort of substantive review of the plans produced by that process"); *Bradley v. U.S. Dept. of Housing & Urban Development*, 658 F.2d 290, 294 (NEPA did not apply where "[t]he federal government had absolutely *no* substantive control over the contents of the plan") (emphasis original).

Of course, the twin rationales of "consent" and "control" for when NEPA may be extended to non-federal entities do not necessarily conflict. When a non-federal entity yields control over its project to a federal agency this presents the paradigm case for when consent to federal regulation should be presumed. In the end, however, this court questions the utility of the concept of "consent," as a test for when NEPA jurisdiction exists because the state actor typically argues quite strenuously that consent to federal jurisdiction has not been given. Indeed, non-federal entities have sometimes gone to great lengths to withdraw consent to federal involvement and yet still have been found to be reached by NEPA's tenacious talons. *See, e.g., Scottsdale Mall*, 549 F.2d at 484 (NEPA applied even though state had returned federal highway funds).

Probably most prevalent in the case law is the statement that a non-federal entity may be reached pursuant to NEPA when

---

**13.** The EIS process contemplates that, to the fullest extent possible ... all agencies of the Federal Government shall—

include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

the non-federal entity is in a "partnership" or "joint venture" with a federal agency subject to NEPA. *See, e.g., Macht v. Skinner,* 916 F.2d 13, 20 (D.C.Cir.1990) (holding NEPA inapplicable where there was no " 'partnership' or 'joint venture' with the federal government"); *Silva,* 473 F.2d at 290 n. 5 ("once the partnership stage has been reached between the federal and non-federal entities, all parties in a project are subject to injunctive process"). Nevertheless, though the cases speak often of NEPA "partnerships" or "joint ventures," the courts typically use these terms with great imprecision, never referring to the common business association law definitions for these terms. Indeed, non-federal entities have sometimes been enjoined even when it was clear that a partnership with the federal entity no longer existed. *See, e.g., San Francisco Tomorrow v. Romney,* 472 F.2d 1021, 1025 (9th Cir.1973) (court held that "for purposes of NEPA, major *federal* action had terminated when" contract for HUD to provide loans was signed but non-federal entity could be enjoined where the federal financial assistance was not complete) (emphasis original).

A review of the cases has led this court to the conclusion that, consciously or not, most courts are engaging in a two-part jurisdictional inquiry to determine if projects significantly affecting the environment, and which involve non-federal entities, may be enjoined pending the completion of an EIS. The first inquiry is simply to ask whether at any time the project involved a major federal action. Sometimes cases are disposed of at this point because there simply has not been enough federal involvement in the project to implicate NEPA. *See, e.g., City of Highland Park v. Train,* 519 F.2d 681, 695 (7th Cir. 1975) ("NEPA's requirement of an environmental impact statement [did] not apply to [a state] project" which involved only "[p]ossible future federal funding"), *cert. denied,* 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976).

Second, if the answer to the first question is yes—there has been major federal action—then the project and any non-federal entities involved in it may be enjoined pending completion of an EIS if there is continued agency involvement in the project such that termination or modification of the agency involvement would terminate or significantly impact the project. The second inquiry then is to ask—whether termination or modification of federal agency involvement would end, cripple or at least significantly affect the project.

Admittedly, in making this inquiry the concept of "control" is key—not, however, in the limited sense that the federal agency must be *actively exercising* discretionary control over some aspect of the project in order for non-federal actors to be enjoined.[14] Rather, the term "control" describes the minimum federal agency involvement that would permit federal court jurisdiction under NEPA if that term is viewed as also encompassing situations in which the cessation of federal involvement would control the destiny of some aspect of the project.

This view of the minimum type of "control" necessary to find jurisdiction over non-federal entities explains cases such as *Van Abbema v. Fornell,* 807 F.2d 633 (7th Cir.1986), where NEPA jurisdiction was found even though the federal agency was not attempting to direct or exercise discretion over the outcome of the project. In *Van Abbema* the plaintiff challenged the Army Corps of Engineers' environmental assessment of an application for a permit to construct a barge loading facility on the Mississippi River. The defendant who was constructing the barge loading facility (Fornell) challenged the court's jurisdiction because the Corps' permit had already been issued and "construction of the facility ha[d] begun." *Van Abbema,* 807 F.2d at 636. The Seventh Circuit rejected Fornell's challenge because it was within the Corps' authority to revoke the construction permit. While the Corps was not attempting to exercise control over the barge construc-

---

**14.** Of course, if the federal agency was continuing to exercise discretionary control over a significant aspect of the ongoing project this would present a clear case for federal court jurisdiction over the project pursuant to NEPA.

tion project, it had that control by virtue of its authority to revoke permission for construction projects located in navigable waters of the United States. *See* 5 U.S.C. § 558(c) (Administrative Procedure Act) (setting forth procedure by which licenses may be revoked by agencies); *Miami Beach Jockey Club v. Dern,* 86 F.2d 135 (D.C.Cir.) (per curiam) (Army Chief of Engineers' permit to locate structure in waterway was revocable), *cert. denied,* 299 U.S. 556, 57 S.Ct. 17, 81 L.Ed. 409 (1936).

In the end, the view of NEPA's jurisdictional reach offered by this court closely tracks the language of the statute which does not speak of "partnerships" "joint ventures" or even "control." Instead, the statute's reach is limited by its express application only to agencies of the federal government.[15] A federal agency is the only entity that can be ordered to prepare an EIS. *See Macht v. Skinner,* 916 F.2d at 18 ("NEPA requires *federal agencies*—not states or private parties—to consider the environmental impacts of their proposed actions") (emphasis original); *Bradford Township,* 463 F.2d at 540 ("the procedural requirements of the National Environmental Policy Act are applicable only to federal agencies").

Of course, because the EIS is designed to inform agency decision-making it is useful only if there are continued agency decisions to be made. *See South East*

*Lake View,* 685 F.2d at 1038–40 (plaintiffs lacked standing under NEPA because substantial completion of the project left agency powerless to alleviate any potential future environmental harms). Thus, where agency involvement in a project is no longer existent courts should decline to require an EIS not because the agency is not in "partnership" with the non-federal entity, or because NEPA does not afford "post-completion relief," but because to require an EIS at that stage would be pointless.

Similarly, because NEPA does not give agencies substantive authority over non-federal entities, an EIS should not be ordered where the agency has little or no control over the outcome of the project, not because the agency has no "control" over the project (of course, it does not) but, because to order an EIS would serve no useful purpose. This analysis reveals why jurisdiction under NEPA is often dependent on the presence of federal funding. It is not that the intrinsic magic of the federal fisc turns state projects into federal ones. Rather, it is that federal funding is often the lifeblood of a project—without it the project dies. Under such circumstances preparation of an EIS would not be a void act because, depending on the results of the EIS, the federal agency at that stage of the project still has the capability of terminating or significantly altering the project. Under such circumstances an exercise of

---

**15.** An exception to this court's two-part test may be where a non-federal entity joins a federal agency in a conscious scheme to avoid the strictures of NEPA. In such a case, there is some authority for enjoining the non-federal entity pursuant to NEPA. *See, e.g., Richland Park,* 671 F.2d at 941 (noting that, "[b]ecause NEPA contemplates a future-looking agency inquiry, the courts have been reluctant, at least in the absence of *blatant bad-faith violations,* to grant relief after the challenged project has been substantially or wholly completed") (emphasis added). Even if such a consciously duplicitous scheme were present, however, if the federal agency were no longer significantly involved in the project it would take a stretch to find that NEPA provided a basis for restraining the non-federal entity, as NEPA's requirements apply only to federal agencies.

Indeed, the single case relied upon by the *Richland Park* court for the proposition that "blatant" NEPA violations can justify relief at an

advanced stage in the project's development was *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 1005–06 (5th Cir.1981). The *Marsh* court enjoined some aspects of the construction of the Tennessee–Tombigbee Waterway, a navigational project of the Army Corps of Engineers, pending the completion of a supplemental EIS even though the project was already 55% complete. At the time the injunction issued in the *Marsh* case, however, the Army Corps of Engineers was still intimately involved in the direction of, and planning for the navigational project. Thus, the case did not involve the use of NEPA to enjoin a non-federal entity where the federal agency was no longer involved in the project. In any case, this court need not decide whether a blatant bad-faith violation of NEPA would justify an injunction against the Vigo County defendants pursuant to NEPA as TERCI failed to introduce any evidence from which this court could infer the bad-faith of the county defendants.

the court's injunctive power against state actors who would seek to continue with the project is not really an extension of NEPA but is rather an exercise of the court's inherent authority to enforce its orders and prevent its injunction against the federal agency from being rendered moot by state actors who, if not restrained, could make an EIS pointless by carrying a project so far to completion that viable alternatives to the project have been eliminated.

In this case there can be no question but that GSA was engaged in a major federal action when it undertook to sell the Vigo Farm. The remaining question, upon which this court's jurisdiction depends, therefore, is whether there is continued agency involvement in this project such that termination of that involvement would severely impact the County's project. Without such involvement on the part of GSA this court has no authority to enjoin the county defendants and must dismiss this case for lack of jurisdiction. This court has scoured the pleadings and the testimony presented at the hearing to draft the following list of factors relied upon by the plaintiffs to support their contention that Vigo County can be restrained pursuant to NEPA. The factors relied upon by TERCI are:

1. The geographic and environmental interrelationship of each of the three parcels of the Vigo Farm that have been or may be sold to the Vigo defendants.

2. Federal funding for several studies related to the eventual development of the Vigo Farm into an industrial park.

3. The fact that there were contracts executed between GSA and Vigo County to transfer parcels 1(a) and 2 to Vigo County and that the deed to Parcel 1(a) contained an excess profits clause.

4. Knowledge of Vigo County officials and the GSA prior to the sale of the land that it would be used for industrial development and/or that it would be resold to BASF Corporation.

This court will consider each of the above factors in turn.

IV. *Discussion of the Factors Relied Upon by TERCI to Assert Jurisdiction Over the County Defendants Pursuant to NEPA*

A. The Geographic and Environmental Interrelationship of Each of the Three Parcels of the Vigo Farm That Have Been or May Be Sold to the Vigo Defendants Does Not Extend the Jurisdictional Reach of NEPA.

■ At the hearing TERCI's counsel suggested that because the three tracts of land at issue "are geographically connected and have common problems, wetlands, floodplains and other things, that that ... in and of itself, combined with other factors ... constitutes a partnership." Trans. at 129–130. TERCI renewed this argument in its post hearing brief, citing the need for a regional EIS as its first argument in support of its contention that this court has jurisdiction over the county defendants. *See* Plaintiff's Post Hearing Brief at 4. Contrary to plaintiff's understanding of the law, however, neither the geographic interrelationship of parcels of land sold to the same non-federal entity or the fact that a regional EIS should have been prepared adds anything to a determination of whether jurisdiction over a non-federal entity exists under NEPA. The geographic connectedness of the parcels does not change GSA's ability to alter the course of or halt the project at issue.

None of the cases cited by plaintiff supports the proposition that the fact that a regional or programmatic EIS should have been pursued authorizes jurisdiction, pursuant to NEPA, over non-federal entities. *See, e.g., Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (cited in: Plaintiffs' Brief in Opposition to Affirmative Defenses (filed July 23, 1990) at 8; Plaintiffs' Revised Post Hearing Brief at 4); *National Wildlife Federation v. Appalachian Regional Commission,* 677 F.2d 883 (D.C.Cir.1981) (Brief in Opposition to Affirmative Defenses at 8); *Scientists' Institute for Public Information, Inc. v. Atomic Energy Com'n,* 481 F.2d

1079 (D.C.Cir.1973) (discussed by plaintiff at hearing, *see* Trans. at 129–130).

In *Kleppe* the Supreme Court confirmed that regional or programmatic EIS's could be required under NEPA stating that, "when several proposals for … related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together." *Kleppe*, 427 U.S. at 410, 96 S.Ct. at 2730. However, the only officials sought to be restrained in *Kleppe* were "officials of the Department of the Interior … and certain other federal agencies." *Id.* at 394, 96 S.Ct. at 2723. No jurisdictional question regarding the Court's authority over non-federal actors arose in that case.

Like the Court in *Kleppe*, the *National Wildlife* court also noted that, "the environmental consequences of proposed actions must all be considered together in a single, programmatic EIS when their impacts will have a compounded effect on a region," *National Wildlife*, 677 F.2d at 888. However, the *National Wildlife* court went on to find that, even though a programmatic EIS had *not* been prepared, the case *should* be terminated because the highway program at issue had "reached such a stage of *completion* that the programmatic EIS requirement can no longer practically apply." *Id.* at 891 (emphasis added). The *National Wildlife* court did *not* extend jurisdiction to non-federal defendants on the basis of a need for a regional impact statement. Moreover, the *National Wildlife* case stands for the proposition that a regional EIS will not be ordered where the major federal action has been substantially completed, because the preparation of an EIS at that stage would be pointless.

Likewise, the *Scientists'* case did not involve jurisdiction over a non-federal entity. The *Scientists'* court recognized that NEPA afforded only procedural, not substantive relief, noting that an impact statement should be filed at a point in time preceding "[s]ubstantial investments" so that NEPA would not be "thwarted." *Scientists'*, 481 F.2d at 1093.

Thus, instead of supporting plaintiffs' argument that the need for a regional EIS can confer jurisdiction over the county defendants, the above cases merely confirm that the issue of whether a regional EIS should be (or should have been) performed is a purely substantive issue relating to the character, scope and sufficiency of the EIS itself rather than to the jurisdictional question of whether NEPA can restrain the actions of a non-federal entity. Moreover, the cases cited by TERCI support this court's conclusion that, after finding major federal action, the critical jurisdictional question becomes whether the federal agency still retains sufficient involvement in the project to change the course of the project through unilateral action.

B. Federal Funding for Several Studies Related to the Eventual Development of the Vigo Farm into an Industrial Park Does Not Extend the Jurisdictional Reach of NEPA.

██ Despite cautioning by this court, *see, e.g.*, Trans. at 25–26, TERCI's counsel failed throughout the hearing to clearly delineate whether he sought to establish a partnership between the federal government and the county defendants, *see, e.g.*, Trans. at 122 (TERCI's counsel contends that, "there is an ongoing partnership to move this land between the federal government and the county defendant"), or more specifically between GSA and the county defendants. What was clear from the hearing, however, was that TERCI does not contend that any funds from the General Services Administration itself were used to complete the various federally funded studies identified in TERCI's offer to prove.

To the extent plaintiff argues that there was a partnership between the *federal government* and the county defendants, TERCI's case may be dismissed out of hand because NEPA's EIS requirement clearly applies only to "agencies" of the federal government. *See* 42 U.S.C. § 4332.

To the extent TERCI is relying upon federal funding of the studies in order to show a partnership between GSA and the county defendants TERCI must attribute to GSA knowledge of, acquiescence in or support for the studies in a degree sufficient to link these products of other agencies to GSA.[16] TERCI's only attempt to "connect up" these acts of other federal agencies in order to place responsibility for them on the back of GSA has been to assert that GSA knew or should have known of this funding because evidence of it was in the files of the funding agencies and in the files of the county defendants. *See* Trans. at 126–131.

TERCI offers no case law support for the proposition that an agency of the federal government has an obligation to examine the files of entities over which it has no legal authority. Nor did TERCI contend that GSA had legal authority to forcibly examine the files of the county defendants or any agency from which the funds for the studies issued. Moreover, TERCI has no evidence that GSA actually had the knowledge TERCI would like to attribute to it. Thus, there is no basis on which this court could find a partnership based on GSA's involvement in federal funding that allegedly facilitated (by producing various studies) the transfer of the Vigo Farm to third parties.

 This court also rejects TERCI's theory that federal funding *alone* can so imbue a project with a federal character that jurisdiction over a non-federal entity can be obtained pursuant to NEPA. In support of its theory TERCI quotes several cases to the effect that, "there is authority for issuance of an injunction in a NEPA context against *recipients* of federal loans or financial assistance." *Proetta v. Dent,*

484 F.2d 1146, 1148 (2nd Cir.1973) (emphasis original) (*quoted* in Plaintiff's Revised Post Hearing Brief at 16); *see also Ely v. Velde,* 363 F.Supp. 277, 285 (E.D.Va.1973) ("[i]t is this [federal] money which imparts a federal character to a project and gives rise to the necessity of meeting the statutory requirements of [NEPA]"), *rev'd,* 497 F.2d 252 (4th Cir.1974), (*quoted* and miscited as *O'Brien v. Brinegar,* 379 F.Supp. 290 (D.Minn.1974) in Plaintiff's Revised Post Hearing Brief at 17).

While TERCI has shown an ability to pull beneficial language out of cases, it has, for the most part, ignored the context in which that language arose. In *Proetta,* for instance, the court found that, despite anticipated federal funding for an aspect of a construction project, no jurisdiction existed over a non-federal entity pursuant to NEPA, in part, because the potential for rejecting federal funding existed. Similarly, in *Ely* the State of Virginia was permitted to avoid the strictures of NEPA by withdrawing a request for federal funding. In neither of these cases was jurisdiction found over the non-federal actors and, in both the courts noted the absence of present federal involvement or control in the respective projects in reaching the conclusion that NEPA did not restrict the non-federal entities. *See Proetta,* 484 F.2d at 1148 ("the ... project could proceed independently" of federal funds); *Ely,* 363 F.Supp. at 286–87 ("virtually no evidence of federal contacts" and the federal grant program was "designed to be administered ... with very little federal control").

The Second Circuit's approach in *Proetta* is illustrative of the recognition of the limited jurisdictional reach of NEPA that underlies most of the cases.[17] Suit had been brought under NEPA to enjoin the City of

---

**16.** This court uses the phrase "products of other agencies" loosely as TERCI has shown only the ability to trace funds back through various intermediaries to a federal source. No other federal involvement in the creation of the studies at issue has been shown. Moreover, TERCI has not produced any evidence of involvement by any federal agency, other than GSA, in the County's efforts to buy and resell the land, other than this rather attenuated funding connection.

**17.** At the same time a handful of cases exist in which the courts rely on vague and conclusory statements stressing factors quite unrelated to the plain language of the statute in order to find NEPA jurisdiction over non-federal entities. *See, e.g., Burbank Anti–Noise Group v. Goldschmidt,* 623 F.2d 115, 116 (9th Cir.1980) ("the actions here can be undone"), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); *Silva,* 473 F.2d at 290 ("[t]he nexus here ... is so extensive").

New York's demolition of certain buildings to make way for the expansion of a factory. Federal funds were to be used to finance a portion of the factory construction but were not to be used to pay for any of the demolition work. The Second Circuit held that although the owner of the factory had received a loan commitment from a federal agency for the construction project, the City's demolition work could not be enjoined. The court's holding was based both on the fact that the City itself was not the anticipated recipient of federal funds and on "[t]he fact ... that *the expansion project could proceed independently* of the [federal] loan, were other private or governmental financing to be found, and the City's condemnation and possession of this site [did] not legally rely on the [federal] loan commitment." *Proetta*, 484 F.2d at 1148. The *Proetta* court recognized that enjoining the City's demolition work pending the completion of an EIS would have been premature as the federal agency that had agreed to disburse funds to the private factory owner had no real control over the destiny of the project at that early stage.

Federal funding is often a significant factor in creating NEPA jurisdiction over non-federal entities because such funding provides a hook by which the federal agency can control an aspect of the project. *See, e.g., Homeowners Emergency Life Protection Committee v. Lynn*, 541 F.2d 814, 816–17 (9th Cir.1976) (per curiam) (federal funding "unquestionably" made the project a major federal action). If federal funding has been withdrawn or terminated, however, jurisdiction is typically not found. *See, Named Individual Members of San Antonio Conservation Society v. Texas Highway Department*, 496 F.2d 1017 (5th Cir.1974) (NEPA no longer applied after Congress withdrew funding from what was previously a federally funded project, *cert. denied*, 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975)); *Ely v. Velde*, 497 F.2d 252, 257 (4th Cir.1974) (state could avoid injunction under NEPA by returning federal funds); *but see Scottsdale Mall*, 549 F.2d at 489 (finding that highway project was federal despite the fact that the State of Indiana attempted to withdraw the project from federal funding).[18] It is a cardinal rule that prior federal involvement in a project does not make that project ipso facto "forever federal." *City of Boston v. Volpe*, 464 F.2d 254, 258 (1st Cir.1972).

Moreover, if a federally funded project has been completed a suit may not be brought under NEPA to reverse the federal action. *See Florida Wildlife Federation v. Goldschmidt*, 611 F.2d 547, 548 (5th Cir.1980) (substantial completion of portion of federal-aid highway mooted action pursuant to NEPA even though no EIS had been filed) (per curiam); *Ogunquit*, 553 F.2d at 244–47 (despite fact that the Soil Conservation Service had filed an inadequate EIS before beginning work on the federally funded reconstruction of a sand dune, NEPA did not authorize an action seeking a new EIS or reworking of the shoddily completed project after the project was complete). The Seventh Circuit has even held that a plaintiff lacked standing to pursue a NEPA action against an *uncompleted* federally funded building project that was *continuing* to receive federal funds because the building was in the "final stages of construction" and would have been completed and occupied regardless of the outcome of the case. *South East Lake View*, 685 F.2d at 1038–40.

The above cases make it clear that, "the presence of federal financial assistance is ... just one factor in the analysis of whether there is sufficient federal control over, responsibility for, or involvement with an action to require preparation of an EIS." *Atlanta Coalition on the Transportation Crisis*, 599 F.2d at 1347. A federal court should not find jurisdiction under NEPA on the basis of federal funding alone unless that funding continues to give the funding agency control over some aspect of the project.[19] *See Sierra Club*, 848

---

**18.** The *Scottsdale Mall* case is discussed more thoroughly *infra* at 602–04.

**19.** This is even more true when the federal financial assistance is given solely for the purpose of preliminary studies to assess the feasibility of the project. Courts have found such

F.2d at 1089 ("the federal agency must possess actual power to control the nonfederal activity"); *South East Lake View*, 685 F.2d at 1039–40 (agency could not influence course of nearly completed project); *Bradley*, 658 F.2d at 294 ("federal government had absolutely *no* substantive control") (emphasis original); *Atlanta Coalition on the Transportation Crisis*, 599 F.2d at 1344–47 (federal funding for planning was not major federal action where all "decisions are entrusted to the state and local agencies").

In this case the federal funding pointed to by TERCI has long since ended and thus cannot be enjoined. Nor would review of the long past decisions to allocate federal money to study some aspects of the proposed Vigo Industrial Park serve any useful purpose. Moreover, there has been no showing that GSA, the only federal agency sued by TERCI, had any control over the decision of other federal agencies to disburse funds for these studies. Finally, the receipt of federal funds by a state or private entity subjects that entity to restraint under NEPA only so long as the federal agency disbursing the funds retains a degree of influence over the project for which the funds were disbursed. Such control or influence no longer exists in this case. For each of these reasons, the existence of the studies of the Vigo Industrial Park identified by TERCI, for which some federal funds were received, adds nothing to TERCI's argument that continuing jurisdiction exists over the County defendants under NEPA.

C. The Fact That There Were Contracts Executed Between GSA and Vigo County to Transfer Parcels 1(a) and 2 to Vigo County and that the Deed to Parcel 1(a) Contained an Excess Profits Clause Does Not Extend the Jurisdictional Reach of NEPA.

■ As with virtually any transfer of real estate, the sale of portions of the Vigo Farm to Vigo County was facilitated by

written sales documents. These written documents memorialized agreements reached between GSA and the representatives of Vigo County to transfer first Parcel 1(a) and later Parcel 2 to Vigo County. Included in the deed to Parcel 1(a) was an excess profits clause which provided that any profit made by Vigo County as a result of the resale of Parcel 1(a) during the three years subsequent to the original sale to Vigo County had to be returned to GSA. TERCI argues that these contractual relationships and, in particular, the excess profits clause are probative of a NEPA partnership sufficient to support this court's jurisdiction over the county defendants.

TERCI relies on the excess profits clause because the "profit motive" is a required element for a partnership or joint venture under traditional agency and partnership law. *See* Plaintiff's Revised Post Hearing Brief at 11–12. As this court has noted, however, traditional concepts of partnership law are frequently not controlling or (at least in some cases) not relevant in the NEPA context. *See supra* at 594–95. More important is the extent to which the federal agency retains control over an aspect of the non-federal entity's project.

There is no indication in this case that any of the documents of sale, including the excess profits clause itself, gave GSA continuing discretion or control over the actions of Vigo County. In a similar context it has been noted that GSA has no such control once a sales contract for excessed federal land has been executed. *See Conservation Law Foundation*, 707 F.2d at 636 ("GSA has no power to assure that the ... development plans [for former federal lands] are ever implemented"). Thus, this court concludes that the documents of sale and the excess profits clause do not provide a basis for extending jurisdiction over the county defendants pursuant to NEPA.

This court is not persuaded to a contrary conclusion by TERCI's citation of *Burbank Anti-Noise Group v. Goldschmidt*, 623

funding of preliminary studies insufficient to support jurisdiction under NEPA in a long line of cases. *See, e.g., Macht*, 916 F.2d at 16; *Bradley*, 658 F.2d at 294; *Atlanta Coalition*, 599 F.2d

at 1347; *Hawthorn Environmental Preservation Ass'n v. Coleman*, 417 F.Supp. 1091, 1099 (N.D.Ga.1976), *aff'd*, 551 F.2d 1055 (5th Cir. 1977).

F.2d 115 (9th Cir.1980) (per curiam), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). In *Burbank Anti–Noise* the plaintiffs sought to reverse the sale of the Hollywood–Burbank Airport from one non-federal entity to another because the purchasing entity had received financial assistance from the Federal Aviation Administration (FAA) and, the FAA had allegedly not completed a sufficient EIS. On appeal the defendants contended "that the case [was] moot because the federal funds have already been distributed and title to the Airport transferred." *Burbank Anti–Noise*, 623 F.2d at 116. The appellate court responded that the case was not moot because the actions of the parties could be "undone." *Id.* The court stated that if the plaintiffs "were to prevail ... this Court could remand with instructions to the District Court to order a transfer of the Airport title back to [the original owner] and a return of the money to the FAA." *Id.* (*citing Gonzales v. Costle*, 463 F.Supp. 335, 338 (N.D.Cal.1978), *aff'd*, 688 F.2d 1263 (9th Cir.1982)). The *Burbank Anti–Noise* court went on to hold, however, that the summary judgment of the district court against the plaintiffs should be affirmed because under the facts of the case "no EIS was necessary." *Burbank Anti–Noise*, 623 F.2d at 116.

Initially, this court notes that because no EIS was necessary the *Burbank Anti–Noise* court's conclusion that it had jurisdiction is dicta. Moreover, the abbreviated jurisdictional discussion in the *Burbank Anti–Noise* per curiam opinion presents a classic case for caution in the application of non-necessary legal discussions. The only case relied upon by the appellate court in reaching its conclusion that it had jurisdiction was a district court case in which NEPA and its narrow jurisdictional reach was not even at issue.

This court can only can conclude that had the Ninth Circuit carefully considered the jurisdictional issue, it, like the majority of other courts that have reached the issue, would have concluded that NEPA does not provide a basis for substantive relief against non-federal actors once the role of the federal agency has been completed. In any case, this court is bound to follow Seventh Circuit precedent in this regard and considers the *South East Lake View* case controlling. *See South East Lake View*, 685 F.2d at 1039–40 (plaintiffs did not have standing because substantial completion of the project had rendered the agency powerless to remediate future environmental harms).

D. Knowledge of Vigo County Officials and Officials of the GSA Prior to the Sale of the Land that It Would Be Used for Industrial Development and/or that It Would Be Resold to BASF Corporation Does Not Extend the Jurisdictional Reach of NEPA.

The EA filed by GSA noted that if the Vigo Farm was sold to Vigo County it was anticipated that the land would be used for industrial development. There can be little question but that this knowledge was relevant to GSA's decision regarding whether to prepare an EIS. *See Conservation Law Foundation*, 707 F.2d at 633 ("fact that GSA cannot control the land once it is transferred is no reason not to take a look at whether the land should be sold ... [s]uch a hard look necessarily includes speculation ... about likely reuses of the property"). Such knowledge, however, is not a factor affecting the jurisdictional reach of NEPA, save perhaps if there was an element of bad faith involved in the non-federal actor's efforts to avoid the application of NEPA's requirements. *See supra* at 596 n. 15 (discussing possibility that non-federal actors can be enjoined for bad faith violations of NEPA).

An interesting case in this regard is the *Scottsdale Mall* case, decided by the Seventh Circuit, in which NEPA was held still applicable to a highway project of the Highway Commission of the State of Indiana after the State had attempted to remove federal involvement and funding from what began as a federally funded highway project. The *Scottsdale Mall* court held that:

Indiana's seeking and receiving *federal approval* at various stages of the project *and* receiving preliminary *financial ben-*

*efits so imbued the highway project with a federal character that,* notwithstanding the state's withdrawal of the project from federal funding consideration, *compliance with federal environmental statutes was necessary.*

*Scottsdale Mall,* 549 F.2d at 489 (emphasis added).

While this language would seem to describe an expansive view of the reach of the NEPA statute, a closer review of the facts in the *Scottsdale Mall* case reflects that that case is not inconsistent with the principle demonstrated in the preceding sections, i.e., that once a federal agency no longer retains discretion over at least some aspect of a project, the project can no longer be enjoined pursuant to NEPA.

In *Scottsdale Mall* the State of Indiana attempted to shed itself from the fetters of NEPA by eliminating federal involvement in the highway project at issue (a 20 mile segment of a by-pass around the City of South Bend, Indiana). The State attempted to remove federal participation in the project by, in the State's words, "refund[ing]" federal funds already disbursed to the State for the by-pass. In reality what the State did, however, was to simply move the federal funds to other state projects and fund the by-pass with state monies, a move that the court noted was no more than an "accounting transfer." *Id.* at 487.

While the language used by the *Scottsdale Mall* court does not emphasize continuing control by the United States Department of Transportation over the South Bend by-pass project, there can be little doubt that the federal agency continued to maintain significant leverage over the actions of the Indiana Highway Commission.[20] Federal funds may have ceased to flow to the project in South Bend but, it is obvious that all that was happening was that federal funds that would have gone to the South Bend project were being diverted to other Indiana highway projects and state funds that would have been spent on those

projects were instead spent on the South Bend by-pass. Given this reality, this court does not view the *Scottsdale Mall* case as a departure from the rule that NEPA jurisdiction over non-federal entities is limited to occasions when the federal agency maintains a degree of control over the non-federal entity. As a practical matter, the Indiana Highway Commission could have ignored the Department of Transportation's concerns with the South Bend project only at the risk of jeopardizing future federal funding of other Indiana highway projects. Thus, as a practical matter, the Department of Transportation's views could have had an impact on the ultimate outcome of the South Bend project and preparation of an EIS would, therefore, not have been pointless.

Another way to view the *Scottsdale Mall* case is to group it in that limited number of cases that suggest that bad-faith can provide a basis for applying NEPA's requirements to non-federal entities. In *Scottsdale Mall* the court chastised both the federal agency and the State of Indiana for "less than exemplary" conduct in attempting to comply with the EIS requirement before Indiana decided to attempt to withdraw the project from federal control and emphasized that Indiana's purported "withdrawa[l]" of the project from federal funding was really no more than an accounting sleight of hand. *Scottsdale Mall,* 549 F.2d at 487.

This court has not found such subterfuge present in this case. TERCI has simply presented no evidence of a conscious intent to avoid the dictates of NEPA. Accordingly, this court finds that the knowledge of the either or both the federal and/or the county defendants that the land was to be used for industrial development or even that it would be sold to BASF for industrial development cannot extend the jurisdictional grasp of NEPA in this case.

In addition, it is apparent that the *Scottsdale Mall* court never focused on the fact that NEPA expressly restricts only federal

---

**20.** The Indiana Highway Commission was the non-federal entity responsible for the South Bend by-pass project.

agencies. This oversight was made clear by the court's statement that plaintiff's suit was based, in part, on the fact "that the *State* had not filed an Environmental Impact Statement (EIS) as required by federal law." *Id.* at 486. An oversight this was, for it is beyond question that only federal agencies (and not states) can be required to file an EIS. *Kleppe,* 427 U.S. at 406 n. 15, 96 S.Ct. at 2728 n. 15 ("the section contemplates a consideration of environmental factors *by agencies*") (emphasis added); *Bradford,* 463 F.2d at 540 ("the procedural requirements of [NEPA] are applicable only to federal agencies"); *People By and Through California Dept. of Transportation v. City of South Lake Tahoe,* 466 F.Supp. 527, 534–36 (D.C.Cal.1978) (holding that a bi-state planning organization—the Tahoe Regional Planning Agency—formed by interstate compact was not a federal agency and was, therefore, not subject to NEPA).

Thus, the *Scottsdale Mall* court appears not to have carefully considered the source of NEPA's limited jurisdictional reach—i.e., the statute's express application only to agencies of the federal government. In this regard, the case must be considered an aberration in Seventh Circuit precedent, as the Seventh Circuit's other NEPA cases reflect a keen awareness of the limits of NEPA's applicability.[21] *See, e.g., State of Wisconsin,* 745 F.2d at 416 (NEPA imposes only "procedural" duties on the agencies); *South East Lake View,* 685 F.2d at 1039–40 (refusing to find standing where project was substantially complete); *City of Highland Park,* 519 F.2d at 695 (NEPA did not apply to a project where only possible "future federal funding" was all that was shown); *Bradford Township,* 463 F.2d at 540 (NEPA does not "establish substantive rights"); *see also River Road Alliance,* 764 F.2d at 449 ("an agency's decision not to prepare an environmental impact statement will be set aside only if it is an abuse of discretion").

In summary, while this court shares the plaintiffs' obvious concern for the fragile environment, that concern is not sufficient to create jurisdiction in this court to shoot down the past land sales of GSA to the non-federal defendants. NEPA requires an agency to take a hard look at its future actions which raise significant environmental concerns. The statute does not, however, visit responsibility for the failures of federal agencies upon non-federal entities that are not engaged in an ongoing relationship with the federal agency.

Isolated sales of land do not a partnership make. Even more significant, TERCI has not shown that at this stage GSA can any longer exercise discretion over any aspect of the project related to the completed land sales. Thus, with respect to the completed land sales, insofar as NEPA is concerned, what has been done, cannot be undone. When the land at issue was sold GSA lost its legal right and its practical ability to control the destiny of that land. NEPA does not invest in this court the power to rescind the completed land sales and return what is now Vigo County's property to the federal government, no matter how desirable that result might be. *See South East Lake View,* 685 F.2d at 1041 (Cudahy, J., concurring) (noting the "distressing" implication of the *South East Lake View* case that "environmental considerations ... can be effectively ignored when [efforts to complete the project] proceed so much more rapidly than the litigation challenging the project").

## V. *Discussion of the Ripeness of TERCI's Suit to Enjoin the Future Sale of the 17.65 Acre Tract*

■ As for the 17.65 acres that have not yet been sold, the parcel will not be sold until a contamination study has been completed. Moreover, although this land has been declared excess property, a disposal plan and an environmental assessment have yet to be completed with respect to it. Thus, there has been no proposal for

**21.** Interestingly, since it was decided over fourteen years ago, the *Scottsdale Mall* case has never been cited by a panel of the Seventh Circuit.

federal action [22]—a requisite before jurisdiction under NEPA can be obtained. *See, e.g., Kleppe,* 427 U.S. at 406 n. 15, 96 S.Ct. at 2728 n. 15 ("the time at which a court enters the process is when the report or recommendation on the proposal is made ... [t]his is the point at which an agency's decision has reached sufficient maturity to assure that judicial intervention will not hazard unnecessary disruption") and 427 U.S. at 410 n. 20, 96 S.Ct. at 2730 n. 20 ("[t]he statute ... speaks solely in terms of *proposed* actions; it does not require an agency to consider the possible environmental impacts of less imminent actions"). TERCI's potential suit with respect to the 17.65 acre parcel still in the possession of GSA is, therefore, not ripe.

That means that TERCI will need to keep a watchful eye out for notice that a disposal plan has been adopted should it want to make its position known with respect to the need for an EIS.[23] *See Ogunquit,* 553 F.2d at 246 ("The [NEPA] process puts burdens on federal agencies; but it also demands, if it is to achieve its objective, a certain duty of attentiveness from citizens"). That burden should not be onerous, however. GSA regulations require that notice of the disposal of excess property must be given to the public. *See* 41 C.F.R. § 101–47.303–2(b), (c) (requiring that "[b]efore public advertising, negotiation, or other disposal action, the dispos[ing] agency shall" post notice "in the post office which serves the area in which the property is located").

VI. *Conclusion*

TERCI has failed to carry its burden of proof on the issue of subject matter jurisdiction pursuant to NEPA. Accordingly, this court does not have subject matter jurisdiction over the Vigo County defendants based on NEPA. Plaintiffs' NEPA claims will, therefore, be DISMISSED pursuant to a separate written order. The counterclaims of the Vigo county defendants remain pending before this court.

---

**22.** A " '[p]roposal' exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated." 40 C.F.R. § 1508.23.

**23.** Of course, it is hoped that after reading this entry GSA will give serious consideration to the need for conducting an EIS should it decide to dispose of the 17.65 acre parcel.