**CITIZENS ALERT REGARDING THE ENVIRONMENT, et al.**
**Plaintiffs,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.**
**Defendants.**

**No. CIV.A. 03–0417(ESH).**

United States District Court, District of Columbia.

March 15, 2003.

John E. Childe, Jr., Palmyra, PA, for Jefferson Township.

Joseph S. Cigan, Wilkes-Barre, PA, Kimberly A. Hummel, for PA Dept. of Environmental Protection, PA Infrastructure Investment Authority.

Lauren Beth Fischer, U.S. Dept. of Justice, Washington, DC, for U.S. Environmental Protection Agency.

Enrico G. Nardone, Babylon, NY, for Citizens Alert Regarding Environment.

Corey Daniel O'Brien, Muldoon, Murphy & Faucette, Washington, DC, Stephen William Saunders, Kreder, Brooks, Hailstone, Scranton, PA, for Lackawanna River Basin Sewer Authority.

### MEMORANDUM OPINION

HUVELLE, District Judge.

This case is here on a request for preliminary injunction, which the Court has consolidated with a trial on the merits pursuant to FED. R. CIV. P. 65(a)(2). Plaintiffs, Citizens Alert Regarding the Environment ("CARE") and David Kurtz, brought this action to enjoin construction of a sewage pipeline currently being built in Lackawanna County, Pennsylvania. Plaintiffs contend that this project is a "major federal action" within the meaning of the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 3332(C), and therefore cannot go forward until the Environmental Protection Agency ("EPA") prepares an environmental assessment ("EA") to determine whether a full-blown environmental impact statement ("EIS") is required. On March 21, 2003, the Court denied plaintiffs motion for a Temporary Restraining Order. The Court now denies the request for a preliminary injunction, and enters summary judgment for defendants on all counts.[1]

---

1. In addition to the EPA, plaintiff has named the following state and municipal entities as defendants: the Jefferson Township Sewer Authority; the Lackawanna River Basin Sewer Authority; the Pennsylvania Department of Environmental Protection, and the Pennsylvania Infrastructure and Investment Authority.

## BACKGROUND

This case represents the latest act in a long-running drama. In 1989, the Pennsylvania Department of Environmental Protection ("PaDEP") issued an order requiring Jefferson Township in Lackawanna County, Pennsylvania to adopt a sewage collection plan to deal with its on-lot sewage problems. The Township has been attempting to satisfy this order ever since. The Township's first so-called Act 537 plan called for building small treatment plants within the Township, with the excess capacity to be treated at an existing local plant. This plan was significantly revised in 1995 when the Township first proposed the idea of building a sewage pipeline over the relatively undeveloped and ecologically sensitive ridgetop known as the Moosic Mountain Barrens. At the time, it seemed likely that an ambitious business park and federal prison complex would be built on Moosic Mountain. Thus, the Township proposed building a new treatment facility to handle its existing needs, as well as the expected growth from the business park. Also, to serve a small residential community situated near Moosic Mountain, a pipeline would be constructed to pump waste into the sewer system that was expected to be built for this new commercial development.

This plan was eventually jettisoned, in large part because of a decision in December 1995 by the Honorable Gladys Kessler of this Court that the plan could not go forward until the federal entities involved complied with NEPA. *See CARE v. Dep't of Justice,* 1995 WL 748246 (D.D.C. Dec.8, 1995). Ultimately, the prison was built elsewhere, and there are no current plans to revive to the business park. The plan to build the Moosic Mountain sewer line, however, has gone forward undeterred. In 1999, a revised Act 537 plan was adopted, which abandoned the idea of building a treatment plant within the Township itself. Instead, the new proposal was to pump *all* of the Township's waste over Moosic Mountain through the pipeline, which would terminate on the other side of the Barrens, at an existing treatment facility operated by the Scranton Sewer Authority ("SSA").

However, after possible environmental obstacles to this plan were highlighted in a legal challenge mounted by CARE before PaDEP, SSA pulled out of the project. As a result, the Township made another revision, keeping the basic plan in place, but altering the direction of the final 8,700 feet of the pipeline (the total length of which is over 7 miles) so that it would terminate not at SSA, but instead at a treatment plant owned by the Lackawanna River Basin Sewer Authority ("LRBSA"). (Aff. of Allan Mykalo, April 2, 2003 [4/2/03 Mykalo Aff.], ¶¶ 2–3.) This plan was announced by the Township on April 18, 2002, and officially adopted as the sixth revision to the Act 537 plan on August 12. PaDEP gave its final approval to the plan on September 27, and the next month granted the Township a permit authorizing construction on the Moosic Mountain pipeline to begin. (*Id.* at ¶ 6.) A State administrative appeal filed by CARE objecting to PaDEP's approval and seeking to block the project was rejected on February 19, 2003.

Because it is crucial to this case, the funding for the pipeline project must be considered in some detail. The estimated total cost of the project is approximately $15 million. Of that, $11 million was provided by Pennsylvania Infrastructure Investment Authority ("PENNVEST"), through the State's Clean Water Act Revolving Fund program. (Penn. Opp., Ex.1 [Marchetti Aff.] ¶ 2.) Under this program, the EPA makes capitalization grants to the states to set up a fund for water pollution control. The states in turn disperse this

money for projects of their choosing, including for the construction of publically-owned treatment works. 33 U.S.C. § 1381. The Township made its initial request for a revolving fund loan in January 2000. (*Id.* at ¶ 5.) After conducting the required environmental review of the project,[2] PENNVEST granted final approval for and actually executed the loan on October 10, 2002. (*Id.* at ¶¶ 2, 6.) Of the funds provided by PENNVEST, 83% derive ultimately from EPA.

EPA money is also connected with this project in another, more direct way. The agency's 1999 Appropriations Act allotted $1,305,000 for "wastewater, sewer overflow, and water system needs" of Jefferson Township. P.L. No. 105–276. An additional $470,500 was appropriated by the 2002 Appropriations Act. P.L. No. 107–73. EPA has discretion as to how it spends these appropriated funds so long as it stays within the general parameters set out by Congress. " (Fed. Def.'s Mot. for Summ. J., Ex. 1 [Murphy Dec.] ¶ 13.) In addition, the money cannot be approved for a particular project until the agency determines that the project complies with all federal laws, including NEPA. (*Id.* at ¶ 8.) Jefferson Township submitted a grant application for the FY 1999 appropriation ($1,305,000) on November 12, 2001; the Township resubmitted that application on September 13, 2002, to include a request for the FY 2002 appropriation. Because this application was incomplete, EPA asked the Township to provide more information, which it did on November 19, 2002. (*Id.* at ¶¶ 5–7.) Having determined that

Jefferson Township had submitted a complete application, EPA at last began its environmental review under the strictures laid down by NEPA.

In connection with this review, EPA has requested additional data about the secondary impacts of the pipeline project. According to the agency, it will not finish its NEPA analysis until this information is provided, and will not award the grant until that analysis is successfully completed. (*Id.* at ¶¶ 8–9.) As such, EPA's position here is that an EA must be prepared before the appropriated funds may be awarded to the Township in connection with the Moosic Mountain pipeline. At present, therefore, the agency has not provided any money for the pipeline and has not committed itself to be involved in the project in any way. (*Id.* at ¶ 10.) Instead, EPA's role has thus far been limited to reviewing the grant application in order to determine whether to fund the pipeline with the appropriations. And while that money has been earmarked for the Township, it was not linked by Congress to this particular construction project. (*Id.* at ¶ 11.) Beginning in May 2002, the agency also sponsored a mediation effort between CARE and the Township in an attempt to help resolve some of the environmental concerns relating to the construction of a sewage pipeline through the Moosic Mountain Barrens. This ADR was terminated in February 2003, when plaintiffs filed the present suit. (*Id.* at ¶ 16.)

In 2002, the Township turned to private sources in order to secure the remainder of the funding it needed to begin construc-

---

2. As explained in greater detail below, EPA regulations mandate that any state participating in the revolving fund program must agree to review the environmental impacts of construction projects receiving funding under that program. This review must mimic the process described in NEPA, or be sufficiently NEPA-like to be approved by EPA based on

criteria prescribed by the agency. *See* 40 C.F.R. § 35.3140. In 1991, EPA approved Pennsylvania's environmental review process (codified at 25 Pa. Code § 965.9(c)), and it is this process which PaDEP applied here as a precondition to PENNVEST's authorization of the revolving fund loan. (Marchetti Aff. ¶¶ 6–7.)

tion.[3] Indeed, under its October 2002 agreement with PENNVEST, the Township was obligated to come up with an equity contribution of $4,201,334. (Marchetti Aff. ¶ 3.) In that agreement, the Township had indicated that it would make this contribution by securing a loan from the PNC Bank. (*Id.* at ¶ 4.) And, on November 15, 2002, the Township closed on just such a loan (technically a Guaranteed Sewer Project Note) in the amount of $4,200,000. (Pl. Kurtz's Mot. for Summ. J., Ex. S.) The receipt of this money, along with that received from PENNVEST, allowed the Township to begin laying the pipeline immediately. The Township wasted little time doing so, commencing construction of the estimated two-year project on November 21, 2003.

In response, plaintiffs filed this action on February 27, 2003. When it became apparent that construction would not be slowed absent judicial intervention, they sought a TRO and a preliminary injunction on March 17. After a hearing, the Court orally denied the request for a TRO on March 21, and ordered that the application for the preliminary injunction would be consolidated with a trial on the merits. *See* FED. R. CIV. P. 65(a)(2). The parties consented, and have now filed what are functionally cross-motions for summary judgment. A second hearing on this matter was held on April 8, 2003. Although the parties were given the opportunity to present live testimony, they each declined, electing instead to rely on the papers, as well as on the affidavits, declarations, and documentary evidence that have been submitted.

## ANALYSIS

### A. Whether Construction of the Pipeline Should be Enjoined Pending Federal NEPA Review

■ NEPA requires that federal agencies take a "hard look" at the environmental consequences of all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).[4] While the statute applies only to federal actions and imposes obligations only on federal entities, it is well-settled that "federal involvement in a non-federal project may be sufficient to federalize the project for purposes of NEPA." *Macht v. Skinner,* 916 F.2d 13, 18 (D.C.Cir.1990); *see also Envtl. Rights Coalition, Inc. v. Austin,* 780 F.Supp. 584, 594 (S.D.Ind.1991) ("NEPA does not provide authority for constraining, restraining, or detaining non-federal entities pursuant to NEPA unless those entities are in a partnership or joint venture with or otherwise closely associated with a federal agency."); *Don't Ruin Our Park v. Stone,* 749 F.Supp. 1386, 1387–88 (M.D.Pa.1990) (observing that a "non-federal entity may be enjoined along with the federal agency pending completion of an EIS" where the former "enters into a partnership or joint

---

**3.** It should be noted that Jefferson Township has actually obtained federal money for its sewage treatment plans from a different source. In January 2000, the Township received a grant of $957,000 from the Army Corps of Engineers. According to an affidavit provided by the Township, this money was used for various purposes, including paying off a previous loan from PENNVEST ($350,-000), as well as working to reconsider an older version of the Act 537 plan and to develop a new one in its place ($350,000). (Aff. of Allan Mykalo, Apr. 7, 2003 [4/7/03 Mykalo Aff.] ¶¶ 2–3.)

**4.** Because NEPA itself provides no private right of action, plaintiffs' claims have actually been brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. *See Tulare County v. Bush,* 306 F.3d 1138, 1143 (D.C.Cir. 2002).

venture with the federal government and becomes the recipient of federal funding"). As such, this case presents the Court with one central issue: whether the Moosic Mountain pipeline project has been sufficiently infused with federal involvement such that Jefferson Township Sewer Authority ("JTSA"), the obviously non-federal entity in charge of the project, should be enjoined from going forward with its construction "until all the federal approvals have been granted in accordance with NEPA." *Macht,* 916 F.2d at 18–19.[5]

For purposes of this analysis, it can be assumed that if EPA actually provides the $1.7 million appropriated by Congress for the Township, that funding decision would itself be a "major federal action." *Cf. United States v. Southern Fla. Water Mgmt. Dist.,* 28 F.3d 1563, 1573 (11th Cir. 1994) (noting that a federal agency may undertake a major federal action in the form of funding a state or local project). Indeed, by taking the position that this money will not be committed for the pipeline in the absence of NEPA review, the agency has acted as if this were so. That said, the question of whether the actual *granting* of EPA money to the Township is subject to NEPA is analytically distinct from the question the Court faces here, which is whether, at present, the degree of federal involvement in the Moosic Mountain pipeline has been sufficient to convert that entire project into a major federal action that cannot go forward until a federal NEPA analysis is completed.[6] *See At-*

*lanta Coalition on the Transp. Crisis v. Atlanta Regional Comm'n,* 599 F.2d 1333, 1347 & n. 18 (5th Cir.1979) (observing that the determination of "whether a program is sufficiently 'federal' to render it subject to NEPA" is a different questions than "whether a federal decision to make funds available is itself major federal action").

■ Answering this question requires the Court to examine carefully the various means through which the Moosic Mountain pipeline may have become federalized. The first candidate is the grant that the Township has already received from Army Corps of Engineers ("the Corps"). *See supra,* note 3. This money, however, provides no basis for the Court to enjoin construction of the pipeline project, because, as plaintiffs have recognized, federal money provided for the preliminary stages of a project otherwise paid for with non-federal money is generally not subject to NEPA at all. Thus, the D.C. Circuit has held that a federal agency's decision to fund an aspect of a project—such as preliminary studies to determine whether the project should be undertaken—that, in and of itself, will have no impact on the environment, is not subject to NEPA. *See Macht,* 916 F.2d at 17. Other courts have concurred in this assessment. *See, e.g., Town of Fairview v. Dep't of Transp.,* 201 F.Supp.2d 64, 77 n. 13 (D.D.C.2002) (funding for "engineering/design" of a project does not constitute a major federal action); *Woodham v. Fed. Transit Admin.,* 125

---

**5.** The question is *not* whether JTSA (or any of the other state or municipal defendants) have *violated* NEPA or whether those defendants should be made to *comply* with NEPA. They could not have and they cannot be. *See Macht,* 916 F.2d at 18.

**6.** Of course, as discussed below, if the grant of federal money is itself immune from scrutiny under NEPA (whether because that grant was not a "major federal action" or for some

other reason), then it follows that the use of such money by state or municipal entities could not be the basis for holding that their otherwise non-federal project became a major federal action. One obvious reason for this conclusion is that it makes no sense to enjoin non-federal entities from acting until such time as the federal agency performs an environmental analysis it is under no legal obligation to perform.

F.Supp.2d 1106, 1109 (N.D.Ga.2000) (no NEPA analysis necessary before federal agency provided money for purchasing property and preliminary development). Thus, because "federal financial assistance to the planning process in no way implies a commitment by the federal agency to ... undertake, fund, or approve any action that directly affects the human environment," such funding does not render an otherwise state or local project sufficiently federal to make NEPA applicable. *Atlanta Coalition*, 599 F.2d at 1347. It follows, therefore, that such funding cannot transform an other otherwise non-federal project into a major federal action. A grant decision that is itself exempt from NEPA cannot subject the *recipient* of the grant to the statute's obligations, and certainly cannot provide the basis for enjoining that recipient until an unnecessary NEPA analysis is completed.

█ In this case, the record indicates that insofar as the Corps' grant was used in connection with Moosic Mountain pipeline, it was used exclusively for the sort of preliminary activity that falls outside of NEPA's reach. According to the Township, part of the money helped JTSA pay off debts incurred in the process of working on a version of the sewage treatment plan that was never built; the rest went for reconsidering those old plans and developing the one that is now under construction. Like providing money for preliminary studies and design, funding the mere development of a plan, where that funding implies no commitment to fund the

actual *execution* of that plan, is not action that can significantly affect the human environment. Thus, because the Corps was under no obligation to perform a NEPA analysis before making its grant, that award can neither have federalized the present pipeline project nor have rendered JTSA subject to an injunction until such an analysis is performed.[7]

█ The Court now turns to the $11 million loan provided by PENNVEST. These funds were supplied out of what is known as a State Revolving Fund ("SRF"). In 1987, Congress added Title VI to the Clean Water Act ("CWA"), creating a program whereby EPA would award grants to the states to establish and capitalize such funds for water pollution control. *See* Water Quality Act of 1987, Pub.L. No. 100–4, *codified at* 33 U.S.C. §§ 1381–87. From an SRF, a participating state may make loans for various projects, including wastewater treatment. 33 U.S.C. § 1381. It is clear, however, that federal capitalization grants made pursuant to the SRF program are categorically exempt from the requirements of NEPA. *See* 33 U.S.C. § 1371(c). This provision mandates that no action taken by EPA pursuant to the CWA "shall be deemed a major federal action ... within the meaning of the National Environmental Protection Act of 1969." There are only two narrow exceptions to this broad exemption: (1) "the provision of Federal financial assistance for the purpose of assisting the construction of publicly owned treatment works as authorized by section 1281 of this title";

---

7. Moreover, even assuming *arguendo* that the Corps money were subject to NEPA, an injunction is not proper here because plaintiffs have not actually sued the Corps. As such, even if the Corps did fail to obey NEPA, that failure would not provide the Court a basis on which to enjoin JTSA (or any of the other state and municipal actors who have been named as defendants) from proceeding with

construction of the pipeline. The Corps is not a party to this action, and the Court is therefore powerless to issue an injunction against it. *See* FED. R. CIV. P. 65(d). Accordingly, the Court is unable to compel those who *are* parties not to act until the Corps complies with a directive that the Court simply lacks the authority to give.

and (2) "the issuance of a permit under section 1342 of this title for the discharge of any pollutant by a new source as defined in section 1316 of this title." 33 U.S.C. § 1371(c).

While the second exception is obviously irrelevant to the PENNVEST money, the inapplicability of the first requires a bit more explanation. Section 1281 refers to Title II of the CWA, the so-called "construction grants program," under which the federal government provides money directly for the construction of treatment works projects. *See* State Revolving Fund Program Implementing Regulations, 55 Fed.Reg. 10176, 10176 (Mar. 19, 1990) ("SRF Regulations"); *Sacramento Regional County Sanitation Dist. v. Reilly*, 905 F.2d 1262, 1264–65 (9th Cir.1990). The Title II program, however, has now been phased out of existence. Congress has made no Title II appropriations since Fiscal Year 1990, and has instead financed treatment projects like the one at issue here through the SRF loan program. *See United States v. Michigan*, 781 F.Supp. 492, 495 (E.D.Mich.1991). Therefore, because the PENNVEST money came to Jefferson Township by way of Title VI, rather than through section 1281, EPA's contribution quite plainly falls outside of exception (1), and therefore outside of NEPA as well. As such, the use of that money to help finance the Moosic Mountain pipeline provides no basis for converting that project into a major federal action.

 Next, the Court addresses plaintiff Kurtz's valiant, but ultimately misguided, argument that exception (2) is actually at play in this project. This argument is based on the increased sewage overflows that allegedly will be caused by the new pipeline. As noted, under § 1371(c)'s second exception, "the issuance of a permit under section 1342 of this title for the discharge of any pollutant by a new

sources as defined in section 1316 of this title" is not automatically immunized from the reach of NEPA. Such permits are known as NPDES ("National Pollutant Discharge Elimination System") permits, and are required before any effluent may be discharged into a waterway. Here, LRBSA has been granted an NPDES permit, which, *inter alia*, allows the Authority to emit a certain amount of sewage into the Lackawanna River at Combined Sewer Outflow ("CSO") 007a. (Penn.Opp., Ex. 2.) Plaintiff Kurtz asserts that the new pipeline will increase sewage outflows beyond the level authorized by this permit, and therefore that EPA was required to perform a NEPA analysis on the project before any construction could begin.

This argument is flawed for several reasons. First, the NPDES permit in this case was issued not by the EPA, but rather by PaDEP. The issuance of federal permits by state entities is specifically authorized by the CWA, which allows states to apply to EPA for permission to handle NPDES permitting themselves. *See* 33 U.S.C. § 1342(c). After EPA grants such permission, the responsibility for issuing permits and for monitoring the use of those permits lies with the state, not with the federal government. *See District of Columbia v. Schramm*, 631 F.2d 854, 857 (D.C.Cir.1980) (noting that while the EPA can veto a state-issued permit, "Congress in this scheme thus placed on the states the burden of administering and approving NPDES applications"). For that reason, once a state assumes responsibility over the NPDES process, the permits that it approves are considered as having been issued by the state, not by EPA.

 As such, the D.C. Circuit held in *Schramm* that the "issuance" of such permits by the state does not fall within the

exception described in § 1371(c).[8] *Id.* at 862. Nor can EPA's failure to object to the State's decision to issue the permit be classified as "major federal action" that would trigger a NEPA analysis. *Id.*[9] Thus, *Schramm* makes clear that Pennsylvania's decision to grant a permit to LRBSA was a state decision, and therefore beyond the scope of NEPA. Neither the EPA nor the State of Pennsylvania had any obligation to comply with NEPA before the permit was issued. And neither the federal government nor the State would have NEPA obligations should it become necessary to *reissue* a permit based on increased outflows generated by the Moosic Mountain pipeline. Accordingly, there is no basis for enjoining the pipeline based on alleged NEPA-related deficiencies regarding the issuance of any NPDES permit.

Moreover, even if such permitting could somehow be described as major federal action, plaintiff Kurtz cannot point to any evidence that the pipeline project at issue here will cause (or is even likely to cause) any violation of the permit that has already ·been issued. The uncontradicted evidence presented by LRBSA states that the "addition of flow from Jefferson Town-ship's planned sewage collection system is not anticipated to cause any violation of NPDES Permit No. PA–0027090 concerning CSO 007a." (Brunamonti Aff. ¶ 7.) Plaintiff has no competent evidence to counter this sworn evidence. There is thus no indication that the completion of the pipeline will require the issuance of a new or modified NPDES permit. And without such an "issuance," the § 1371(c) permit exception does not apply. As such, there is simply no demonstrated link between the project that plaintiffs seek to enjoin pursuant to NEPA and the NPDES permitting process. For these reasons, even if EPA had been involved in the NPDES permit process, no NEPA obligations would thereby have attached to this project. Either way, the Court cannot use the NPDES permit to convert this project into a major federal action.

 This brings the Court to the most promising basis for federalizing the Moosic Mountain pipeline: the $1.7 million congressional appropriation for which Jefferson Township has applied, but which EPA has not yet approved. "Typically, a project is considered a major federal action when it is funded with federal money." *Southwest Williamson County Cmty*

**8.** This is so because § 1371(c) applies only to *federal* actions. Plaintiff, however, suggests otherwise. He notes that while exception (2) mandates that the issuance of an NPDES permit is not categorically exempt from NEPA, it does not specifically limit that mandate to EPA-issued permits. Therefore, plaintiff argues, the issuance of all NPDES permits (whether by EPA or the states) must be subject to NEPA. This is simply wrong. The reason that the exception is not specifically limited to EPA is that § 1371(c)'s exemption (from which the exception is being made) speaks only about an "action of the [EPA] Administrator." In other words, § 1371(c) exempts only *federal* actions from NEPA. But that is so not because the provision means to thereby make *state* actions subject to NEPA, but rather because federal actions were they only kind of action that required an exemp-tion from NEPA to begin with. As noted above, NEPA simply does not apply to non-federal action. And there was no need to exempt the states from a requirement that does not apply to them. It would be quite perverse (not to mention entirely illogical) to interpret a narrow exception to a broad statutory exemption as bringing within the statute a category of action that the statute never presumed to regulate in the first place.

**9.** Moreover, *Schramm* held that where a state issues an NPDES permit, the EPA decision not to object is unreviewable in federal court. 631 F.2d at 859–60. Nor is there a federal cause of action under the CWA to challenge the state's decision to issue the permit. *Id.* at 862–63.

*Ass'n, Inc. v. Slater,* 243 F.3d 270, 278 (6th Cir.2001); *see also* 40 C.F.R. § 1508.18(a) (defining "major federal action" to include "projects or programs *entirely or partly financed,* assisted, conducted, regulated, or approved by federal agencies") (emphasis added); *Dalsis v. Hills,* 424 F.Supp. 784 (W.D.N.Y.1976) ("[A] non-federal entity, such as a private redeveloper, may be enjoined where it . . . has been the recipient of federal funds."). It is otherwise, however, when the federal money is but an expectancy that has not yet materialized. "The possibility that federal funding will be provided in the future is not sufficient to federalize a state project, even when such funding is likely." *Southern Fla. Water Mgmt. Dist.,* 28 F.3d at 1573. Thus, where the federal government has not made a "firm commitment" to fund the project, the non-federal actor's mere anticipation of that money does not convert an otherwise local project into a federal one. *Macht,* 916 F.2d at 17. For example, in *City of Boston v. Volpe,* 464 F.2d 254 (1st Cir.1972), the First Circuit held that a "tentative allocation" of federal funds for an airport construction project, followed by an application for that aid, "does not so federalize a project that all work must stop until a satisfactory environmental impact statement has been issued by a putative federal grantor." *Id.* at 259.

In the present case, the EPA grant has not yet become sufficiently definite to render the pipeline project a major federal action. As matters currently stand, the agency is simply *reviewing* JTSA's application for money that has been appropriated for the Township, but not for this specific project. The decision to approve that application and provide those funds lies solely with EPA, and there is certainly no guarantee that the agency will do so. (Murphy Dec. ¶ 13.) Moreover, at present, "EPA has not committed any funds to the Township sewer project, nor has EPA

committed to be involved in any aspect of this project." (*Id.* at ¶ 10.) The Township's bare expectation that this will occur is not enough to federalize the pipeline. A local entity's mere request for funds does not bind it in the kind of "joint venture" or "financial partnership" with the federal government that has been recognized as the trigger for allowing a court to enjoin non-federal actors in the NEPA context. *Macht,* 916 F.2d at 19–20; *Austin,* 780 F.Supp. at 593–94.

▮▮▮ That said, however, a project may be deemed a major federal action even where federal money has not actually been provided. This happens most often in circumstances where federal entities have sufficient authority over the local project so as to control or influence its outcome. *See Southwest Williamson,* 243 F.3d at 279–81; *Mayaguezanos por la Salud y el Ambiente v. United States,* 198 F.3d 297, 302 (1st Cir.1999) ("[W]e look to whether federal approval is the prerequisite to the action taken by the private actors and whether the federal agency possesses some form of authority over the outcome."); *Maryland Conservation Council, Inc. v. Gilchrist,* 808 F.2d 1039, 1042 (4th Cir.1986); *Austin,* 780 F.Supp. at 594–95 (noting that the "term 'control' describes the minimum federal agency involvement that would permit federal court jurisdiction under NEPA if that term is viewed as also encompassing situations in which the cessation of federal involvement would control the destiny of some aspect of the project."). Where such control exists, "the state may not begin construction of any part of a project if the effect of such construction would be to limit significantly the options of the federal officials who have discretion over substantial portions of the project." *Macht,* 916 F.2d at 19; *Austin,* 780 F.Supp. at 594 (quoting *Sierra Club v. Hodel,* 848 F.2d 1068, 1089 (10th

Cir.1988)) ("[A] a non-federal entity may be enjoined via NEPA when it has yielded to a federal agency 'the ability to influence or control the outcome of the project in material respects.'").

However, this control analysis, which was developed primarily in cases involving federal permits, does not readily translate into the context of anticipated funding. In the permit context, the project (or some aspect of it) simply cannot be built without federal approval. By contrast, a state waiting only for federal *money* generally retains the option of obtaining alternate funding and forging ahead regardless of the federal agency's concerns. In many (though by no means all) cases, the federal funding is not a prerequisite for the project and is not necessary, in either a legal or a practical sense, for the project to be completed as planned.[10] This reality has been recognized by the First Circuit: "A state may, after all, proceed with construction wholly independent of the federal government. Where the state authority does rely on the expectation of federal aid, it goes ahead with construction prior to approval only at great risk to the prospects for funding, since the options of the federal agency become increasingly limited to bald approval or rejection with no opportunity for modification." *City of Boston*, 464 F.2d at 259. If the non-federal actor is prepared to run this risk, it should not be

prevented from doing so merely because its decision "might result in less adequate assessment of environmental considerations." *Citizens for Balanced Env't & Transp., Inc. v. Volpe*, 376 F.Supp. 806, 813 (D.Conn.1974).

This is the situation here. As matters currently stand, in the absence of a decision whether to commit the $1.7 million, EPA has no ability to stop the pipeline, or otherwise modify or control the project. (Murphy Dec. ¶ 12.) Nor is there any indication that the possibility (of which the Township is undoubtedly aware) that this money will never come, or will come with strings attached, "would end, cripple or at least significantly affect the project." *Austin*, 780 F.Supp. at 594–95. Far from it. The undisputed evidence is that if Jefferson Township does not get the EPA money, "the project will go ahead as planned as [it] is being constructed." (4/2/03 Mykalo Aff. ¶ 14.) While the shortfall would have to be made up from other sources, there is nothing to indicate that such cost shifting would have any effect on the pipeline itself or on its ultimate environmental consequences. Given the relatively modest portion of the total project cost that the EPA money would cover (roughly 9 percent), the Township's declaration of financial independence is hardly implausible.[11]

10. The Court recognizes that in some circumstances, such as where the amount of federal money expected is sufficiently massive, or where the non-federal entity has few viable alternative sources of funding, it may be that the anticipated federal dollars do function as an effective precondition for the project, and therefore may be sufficient to convert such projects into major federal actions. This, however, is not the case here.

11. Just as EPA lacks the power to limit the Township's options, the Township's decision to build immediately will not limit EPA's options. The agency always retains the discre-

tion not to provide the funds, or to attach a condition to the grant relating to secondary development in the Barrens that plaintiffs fear may be spurred by the completion of the pipeline. (*Id.* at ¶ 15.) Thus, JTSA cannot be enjoined on the theory that allowing it to proceed will interfere with or otherwise compromise the federal environmental review process. *See Gilchrist*, 808 F.2d at 1042 ("The decision of the Secretary of the Interior to approve the project ... would inevitably be influenced if the County were allowed to construct major segments of the highway before issuance of a final EIS. It is precisely this sort

Therefore, because EPA has no present authority over the project, and because the Township is both willing and able to walk away (if necessary) from the one thing that could give the agency leverage in the future, the Township's decision to request a relatively modest amount of federal funding does not transform its project into a major federal action. Nor does that decision, and the possibility that EPA may come through with a fraction of the overall construction costs, make the Township subject to an injunction pending the federal agency's completion of its NEPA analysis. In this context, such an injunction would serve no useful purpose. *See Austin,* 780 F.Supp. at 596–97. If construction is halted pending NEPA review, and that review convinces EPA that the project should in fact not be funded, that decision will neither prevent the project from being built nor cause it to be significantly altered. The Township has the money in hand to complete the pipeline; the evidence is that it can (and will) build the project to current specifications without EPA's contribution, and regardless of EPA's objections. Under these circumstances, NEPA does not allow the Court to put off the inevitable.

■ This leaves the one last source of project financing that plaintiffs argue makes this project subject to NEPA: the $4.2 million loan that the Township has received from PNC Bank. While this money is obviously not federal, plaintiffs suggest that it was effectively federalized by the representations JTSA made in order to obtain it. According to plaintiffs, there is at least an unresolved issue of fact as to whether the Township would not or could not have obtained the loan had it not told the bank that the borrowed money would be repaid in part from the funds that would be received from EPA. And if the bank loan could not have been obtained without the promise of the EPA money, the former is so infected with the latter that what seems to be private money is properly considered federal.[12]

To support this contention, plaintiffs point to a document apparently submitted by the Township in connection with the loan process that seems to suggest that $1,142,475 of the "EPA Grant" would be used to pay off a portion of the balance of the loan. (Pl. Kurtz's Mot. for Summ. J., Ex. S–16.) However, despite the efforts of both parties to shed light on this document, its actual purpose and meaning remain unclear. In his affidavit, Alan Mykalo, the Chairman of JTSA, stated that the Authority "identified the EPA loan in the PNC bank closing to indicate that we did not need the amount of the EPA grant as part of the loan." (4/2/03 Mykalo Aff., ¶ 12.) It is not clear, however, how this statement jives with the document itself, which at least appears to list the EPA grant (along with tapping fees and the Corps grant) as one of the ways in which the loan would be paid off.[13]

of influence on federal decision-making that NEPA is designed to prevent.").

12. Plaintiffs make a similar argument about the PENNVEST loan, but this can be quickly dismissed. The undisputed evidence, in the form of an affidavit from Paul Marchetti, PENNVEST's executive director, makes clear that the PENNVEST loan agreement "was not contingent in any way upon [JTSA] obtaining grant funds from the United States Environmental Protection Agency ... or any other federal agency." (Marchetti Aff. ¶ 4.) Because plaintiffs have pointed to nothing that contradicts or casts doubt on Marchetti's statement, their efforts to link the PENNVEST money with the EPA funds must be rejected.

13. Making matters even more confusing, the preceding page of the closing document, which lists the "Proposed Funding Sources for the Project," does not mention the EPA money at all, but does mention both tapping fees and the Corps money, as well as the

Plaintiffs also point to the fact that EPA appears to have provided two different versions of a letter to JTSA regarding the nature of the EPA grant for Jefferson Township. On September 19, 2002, Lee Murphy of EPA's Region III wrote a letter to Alan Mykalo that described the two appropriations, but added that "the issues in my letter of September 6, 2002, have not been entirely addressed, which is why EPA has been unable to complete its review of the grant application." The very next day, however, apparently at the Township's request, Murphy sent another copy of this letter, in which the language quoted above was deleted. (Pl. Kurtz's Mot. for Summ. J., Ex. O.) From this, plaintiffs draw the inference that the Township solicited the second letter in order to make it seem to PNC Bank that the EPA money was more definite than it was, and that EPA went along with this deception in order to help the Township secure private financing for its sewer project.

While these documents can lead to innuendo and suggestion, their actual significance is far from clear. For one, the record does not reflect whether either version of the Murphy letter was actually presented to the bank. We also have no information other than the letters themselves that would indicate why the change was requested or why it was made. It can also not be determined what the reference to the EPA grant in the closing papers was meant to convey. Moreover, even assuming the Township *did* intentionally suggest to the bank that the loan would be partially repaid with the EPA grant, there is no evidence that the bank relied on this suggestion in approving the loan. Nor has the Court been presented with the actual loan application or with any statements

made in connection with that application. While the Township has declared that it no longer possesses a copy of the application, neither side produced (or even attempted to gather) any evidence, whether documentary or testimonial, from the bank that might clear up this issue or reveal important information about the bank's decision-making process. As a result, the Court is unable to determine whether and to what extent the Township's representations about the EPA money (whatever those representations actually were) may have persuaded or influenced the bank to loan the money necessary to begin construction of the pipeline.

As such, the question now becomes whether this factual dispute is a material one, that is whether the possibility that the Township may have exaggerated the likelihood that the EPA grant was forthcoming in order to help secure a private loan is sufficient to effectively federalize the money received in that loan. The Court has concluded that this issue is not material to the NEPA question, and therefore that even if the inferences that plaintiffs have drawn are credited, summary judgment is still appropriately granted in favor of defendants. First, regarding the reference to the EPA grant in the loan closing document, it must be emphasized that a project becomes a major federal action by virtue of the role played, and the decisions made, by the federal government. As such, whatever a non-federal entity *says* about the degree of federal involvement cannot and does not substitute for actual federal involvement in determining whether NEPA should apply. For instance, if a local official simply lies to a bank that the federal government will provide the collateral for a loan, and the bank relies on that

PENNVEST loan and a portion of the PNC Bank loan. (Pl. Kurtz Mot. for Summ. J, Ex. S–15.)

misrepresentation to furnish the loan, the project for which the borrowed funds is used is not thereby transformed into a major federal action in the absence of any real federal commitment. And, similarly, where (as here) the federal entity has not yet decided whether to provide funds that a locality has requested, the character of the otherwise non-federal project is not changed merely because the would-be recipient inaccurately suggests that the federal entity has already made its decision.[14] Assuming plaintiffs' inferences are correct, JTSA's actions may well land it in trouble with the bank, especially if EPA ultimately fails to come through with the money. But, once again, JTSA's willingness to take this risk does not provide a basis for enjoining its gamble until EPA discharges its NEPA obligations.

In light of the above analysis, EPA's actions in connection with the second Murphy letter give the Court greater pause. Nevertheless, several considerations persuade the Court that the mere existence of the second letter cannot defeat defendants' argument that the present project was not a major federal action. As noted, there is absolutely no indication in the record that either version of the letter was actually provided to the bank, or that the bank was ever made aware of any statements made by EPA regarding the grant money. Moreover, even if it had been submitted, the second letter is not inaccurate, nor is it necessarily misleading; it simply relates that two appropriations bills had "earmarked" money for "sewer or water infrastructure needs in Jefferson Township, as part of the budget for the Environmental Protection Agency." It does not say that the money has been committed to the Moosic Mountain pipeline project, or that

those funds had already been promised or awarded to JTSA. If the bank relied on this letter, it did so at its own risk. At bottom, there is simply not enough in this letter for it to change the fundamental nature of the bank's money, making public and federal what was private and local.

## B. Whether EPA's Approval of Pennsylvania's Environmental Review Violated the APA

Plaintiffs make one final argument. Moving away from the claim that the pipeline project is a major federal action, CARE asserts that EPA "acted arbitrarily and capriciously in failing to ensure that Pennsylvania adopt and implement a legally adequate state environmental review process (SERP)." (CARE's Mem. at 21.) Some background is in order here. As described above, the 1987 CWA amendments created the State Revolving Fund program, under which EPA provides money to the states, which they use to make loans for various projects related to federal clean water goals, including wastewater treatment. See 33 U.S.C. §§ 1381–87. By regulation, the EPA has required that states participating must "agree to conduct reviews of the potential environmental impacts" of all construction projects receiving assistance from an SRF. 40 C.F.R. § 35.3140(a). These reviews must "reflect[ ] the essential elements of NEPA." See SRF Regulations, 55 Fed.Reg. at 10178.

To satisfy this mandate, the state must do one of three things: (1) follow NEPA itself; (2) implement a review process that "conforms generally" to NEPA; or (3) provide an alternative SERP that meets

---

14. As Tweedledee famously observed: "if it was so, it might be; and if it were so, it would be; but as it isn't, it ain't. That's logic." LEWIS CARROLL, ALICE THROUGH THE LOOKING GLASS, chap. 4. If the federal money had actually been authorized, this might be a federal project; but as it hasn't, it isn't, no matter what JTSA says.

the particular requirements specified by the EPA. 40 C.F.R. § 35.3140(b)-(c). Using criteria provided in the regulation, EPA must "review and approve any State NEPA-like and alternative procedures to ensure that the requirements for both have been met." *Id.* at § 35.3140(d). Once EPA approves the SERP, the state is responsible for implementing and applying that plan to the particular projects that it chooses to fund out of its SRF. *See* 33 U.S.C. § 1383(b) ("Each State water pollution control revolving fund shall be administered by an instrumentality of the State ...."); SRF Regulations, 55 Fed.Reg. at 10176 ("Each SRF is to be administered and operated by the State, with minimal Federal requirements imposed on its structure.").

When it decided to create an SRF program, the State of Pennsylvania elected to provide a SERP that was not specifically based on NEPA, but instead one that applied preexisting state environmental review provisions. EPA approved this SERP pursuant to § 35.140(d) in February 1991. (Fed. Def.'s Mot., Ex. 3.) Applying those provisions here, PaDEP conducted a review of the environmental impacts of the Moosic Mountain pipeline in connection with Jefferson Township's application for the $11 million PENNVEST loan provided through the SRF program. Plaintiffs concede that any challenge to this review presents a question of state law that is not cognizable in this Court.

Plaintiffs assert, however, that this Court can entertain a claim not against PaDEP, but rather against EPA, based on the latter's alleged failure to ensure that Pennsylvania's SERP comports with the standards prescribed in 40 C.F.R. § 35.3140. Assuming the theoretical viability of such a claim, plaintiffs' articulation of it here is time-barred. Plaintiffs contend that EPA's approval of Pennsylvania's

SERP must be set aside because it is clear that the State's plan that it makes no provision for considering the secondary and cumulative effects of proposed actions, and the consideration of such effects lies at the heart of NEPA. (CARE's Mem. at 25–28.) This is a claim under the APA, which is subject to that statute's six-year statute of limitations. *See Impro Prods., Inc. v. Block,* 722 F.2d 845, 850 (D.C.Cir.1983). However, the final agency decision to approve the SERP occurred in 1991, twelve years before the present action was brought. Any alleged faults in the plan are apparent on its face, and as such were known to EPA in 1991. And if the approval of the plan despite these defects violated the APA, it is simply too late to challenge that decision now.

Plaintiffs try to escape this fate by claiming that EPA *continues* to allow the State to apply the allegedly impermissible SERP. At most, this is an assertion that EPA compounded its mistake by not correcting it later. In substance, however, it remains a challenge to the original error, and in the absence of an allegation that the plan has changed since 1991 (which plaintiffs do not make), this argument simply restates the claim that the agency acted arbitrarily and capaciously in approving the SERP in the first place.

The lack of such an allegation also dooms plaintiffs' attempt to rely on the periodic audits that EPA conducts of SERPs. The agency has represented that the purpose of those audits is to determine whether the state is in fact implementing the same process that was originally approved by the federal government. (Hearing Tr., Apr. 8, 2003, at 56–57 ("EPA conducts annual inspections to evaluate whether or not the state is properly complying with their SERP as approved in 1991.").) In other words, EPA's role here is *not* to continually verify that the SERP

is sufficiently NEPA-like; that determination was made at the time of approval. Nor is the agency's role to ensure that the state's environmental reviews of particular projects are correct or consistent with NEPA; that power lies with the state courts or state administrative review process. Instead, EPA's post-approval task is merely to ensure that the plan originally approved by the agency is in fact the plan being used by the state. And because plaintiffs have not alleged that the SERP applied to the Moosic Mountain pipeline is in any material way different from the SERP approved by EPA in 1991, they have not laid a proper predicate for a claim that EPA unreasonably mishandled its limited post-approval review.

Nor have plaintiffs pointed to anything in the statute or its implementing regulations that requires EPA to assume any greater or more intrusive role. Indeed, in light of the opportunity to challenge the application of a SERP to a particular project in state court, it is not clear why EPA should (or, *could* consistent with Title VI, the purpose of which was to allow the States greater flexibility and discretion in making loans for construction of water treatment projects like the one at issue here) exercise this kind of ongoing and project-specific supervisory role. But, even if EPA had assumed such a heady task, it is far from clear that the Court could review the agency's decision not to object to the way in which a state has applied its previously-approved SERP to a particular project. In the absence of stat-

utory or regulatory standards against which to evaluate such inaction, EPA's decision is likely "committed to agency discretion by law," and thus unreviewable under the APA. 5 U.S.C. § 701(a)(2); *see Drake v. FAA*, 291 F.3d 59, 70–71 (D.C.Cir.2002) (holding that an agency decision not to take enforcement action is immune from judicial review in the absence of meaningful standards constraining the agency's decision).

In *Schramm*, for example, the D.C. Circuit held that an analogous EPA decision not to veto a state's issuance of an NPDES permit had been committed to agency discretion by law. In that context, as in this one, Congress placed the primary regulatory burden on the states, and gave the EPA no clear guideposts to follow in supervising state action. As such, "[g]ranting federal court review of the Agency's actions in cases such as this one would upset the federal-state balance struck by Congress: it would allow parties to create a basis for federal jurisdiction when federal involvement is merely secondary." 631 F.2d at 860–62. Just so here.[15]

For these reasons, it is clear that plaintiffs have presented no valid basis for challenging EPA's review of the environmental review conducted by Pennsylvania before the PENNVEST loan was extended to the Moosic Mountain pipeline. As such, this claim for relief must also be rejected.

### CONCLUSION

For the reasons stated above, plaintiffs cannot establish that the Moosic Mountain

---

**15.** Moreover, the claim that EPA has an ongoing responsibility to review Pennsylvania's *implementation* of the SERP with respect to every SRF-funded construction project represents an impermissible attempt to dress up a state law claim in a different costume. Such a claim is an effort to make an end-run around state jurisdiction by converting what is really an as-applied challenge to the ade-

quacy of state environmental review into an APA claim that EPA should have stopped the state from using its SERP in a particular case. Even putting aside the reviewability problems highlighted above, the Court would have difficulty accepting this effort to bring to federal court a claim substantively identical to one that plaintiffs concede belongs in state court.

pipeline is a major federal action; the Court therefore lacks jurisdiction to enjoin construction of that project pending a federal NEPA analysis of the pipeline's projected environmental impact. Nor have plaintiffs stated a valid claim that EPA violated the APA by not objecting to the environmental impact analysis performed by the Pennsylvania Department of Environmental Protection. Accordingly, plaintiffs' request for a preliminary injunction and motions for summary judgment will be denied, and summary judgment will be entered in favor of defendants on all claims.

## ORDER

For the reasons given in the attached Memorandum Opinion, it is hereby

**ORDERED** that plaintiffs' motions for a preliminary injunction are **DENIED**; it is

**FURTHER ORDERED** that defendants' motions for summary judgment are **GRANTED**; it is

**FURTHER ORDERED** that plaintiffs' motions for summary judgment are **DENIED**; and it is

**FURTHER ORDERED** that plaintiffs' complaint is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**